PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

VILLAGE OF BALD HEAD ISLAND,

        *Plaintiff-Appellant,*

      v.

UNITED STATES ARMY CORPS OF
ENGINEERS; UNITED STATES OF
AMERICA; THE HONORABLE JOHN
MCHUGH, in his official capacity;
LT. GEN. ROBERT L. ANTWERP, JR.,
in his official capacity; MAJ. GEN.
TODD T. SEMONITE, in his official
capacity; COL. JEFFERSON M.
RYSCAVAGE, in his official
capacity,

        *Defendants-Appellees,*

      v.

TOWN OF CASWELL BEACH; TOWN OF
OAK ISLAND, NORTH CAROLINA,

        *Intervenors/Defendants.*

No. 11-2366

VILLAGE OF BALD HEAD ISLAND,

*Plaintiff,*

v.

UNITED STATES ARMY CORPS OF ENGINEERS; UNITED STATES OF AMERICA; THE HONORABLE JOHN MCHUGH, in his official capacity; LT. GEN. ROBERT L. ANTWERP, JR., in his official capacity; MAJ. GEN. TODD T. SEMONITE, in his official capacity; COL. JEFFERSON M. RYSCAVAGE, in his official capacity,

*Defendants-Appellees,*

v.

TOWN OF CASWELL BEACH; TOWN OF OAK ISLAND, NORTH CAROLINA,

*Intervenors/Defendants-Appellants.*

No. 11-2368

Appeals from the United States District Court
for the Eastern District of North Carolina, at Wilmington.
Terrence W. Boyle, District Judge.
(7:10-cv-00251-BO)

Argued: October 25, 2012

Decided: April 15, 2013

Before NIEMEYER, GREGORY, and THACKER,
Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Gregory and Judge Thacker joined.

---

**COUNSEL**

**ARGUED:** George W. House, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, Greensboro, North Carolina, for Appellants. Thekla Hansen-Young, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** William P.H. Cary, Alexander Elkan, Joseph A. Ponzi, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, Greensboro, North Carolina; Steven J. Levitas, Todd S. Roessler, KILPATRICK TOWNSEND & STOCKTON LLP, Raleigh, North Carolina, for Appellants. Ignacia S. Moreno, Assistant Attorney General, Jennifer Scheller Neumann, Environment & Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Brooke Lamson, District Counsel, U.S. ARMY CORPS OF ENGINEERS, Wilmington, North Carolina, for Appellees.

---

**OPINION**

NIEMEYER, Circuit Judge:

The Village of Bald Head Island, a coastal town in North Carolina, commenced this action under the Administrative Procedure Act ("APA") and admiralty jurisdiction against the U.S. Army Corps of Engineers to require it, through an order of specific performance and injunction, to honor commitments made to the Village and other North Carolina towns when developing its plans to widen, deepen, and realign portions of the Cape Fear River navigation channel. The Village alleged that when implementing the project, the Corps failed to honor commitments to protect the adjacent beaches against

the adverse effects of the project and to restore sand to the beaches, in violation of the National Environmental Policy Act, the Coastal Zone Management Act, the Rivers and Harbors Act, Corps Regulation 33 C.F.R. § 337.10, and contract principles.

The district court dismissed the complaint for lack of subject-matter jurisdiction, concluding that the Corps' alleged failure to implement the project in accordance with its commitments was not "final agency action" that was subject to judicial review under the APA and that it lacked admiralty jurisdiction over the complaint's contract claims.

We agree with the district court's holding that the Corps' failure to implement "commitments" made to the Village during development of the plans for the project was not final agency action subject to judicial review, and we also conclude that the alleged contracts on which the Village relies for its contract claims are not maritime contracts that justify the exercise of admiralty jurisdiction. Accordingly, we affirm.

I

Since the 1800s, the U.S. Army Corps of Engineers has maintained a navigation channel in the Cape Fear River that allows vessels coming from the Atlantic Ocean to access the deep-water port in Wilmington, North Carolina. In the 1980s and 1990s, the Corps advanced proposals to widen and deepen the 37-mile channel, and Congress approved them in the 1986 and 1996 Water Resources Development Acts. Pub. L. No. 99-662, § 202(a), 100 Stat. 4082 (1986); Pub. L. No. 104-303, § 101(a)(23), 110 Stat. 3658 (1996). Shortly thereafter, it combined these projects into a single project, *see* Energy and Water Development Appropriations Act, Pub. L. No. 105-62, tit. I, 111 Stat. 1320 (1997), referred to here as the Wilmington Harbor Project.

In June 1996, the Corps prepared an Environmental Impact Statement for the project and scheduled construction to begin

in 2000. Before construction began, however, the Corps discovered an area of rock at the bottom of the channel that would require extensive blasting to remove and learned that the planned extension of the channel would cut through a substantial amount of live coral, causing ecological damage. As a result, it proposed several revisions to the project, including a realignment of the channel's entrance closer to Bald Head Island. It also proposed to dispose of beach-quality sand dredged during the project's construction and subsequent maintenance on the adjacent beaches of Bald Head Island and Oak Island, two barrier islands located on either side of the entrance to the Cape Fear River.

In connection with these proposed revisions, the Corps issued an Environmental Assessment in February 2000, evaluating the revised project's environmental impacts, as well as its consistency with North Carolina's Coastal Management Plan. The Environmental Assessment included a Sand Management Plan, which described in detail the Corps' plan for depositing dredged beach-quality sand on nearby beaches during construction of the project and predicted the need, after work was complete, to perform "maintenance dredging" every two years. Because a study showed that approximately two-thirds of the sediment at the entrance of the channel came from Bald Head Island and one-third from Oak Island, the Sand Management Plan provided that the dredged beach-quality sand would be placed on Bald Head Island in years two and four following the completion of the project and on Oak Island in year six and that this "disposal cycle" would be followed thereafter.

The Corps also developed the Wilmington Harbor Monitoring Plan, which established a "routine monitoring program" to observe "the response of the adjacent beaches and the shoaling patterns in the entrance channel" and to use the data derived from those observations to make an "initial assessment of the impacts of the sand management plan on the system." The monitoring plan provided that "[a]ny changes in the

sand management plan . . . [would] be fully coordinated with all interested parties prior to implementing any such change."

Both before and after the Corps conducted its Environmental Assessment, the Village of Bald Head Island provided numerous comments to the Corps. The Village contended generally that the Corps' operation and maintenance of the channel in the past had adversely impacted Bald Head Island's shoreline, and it expressed concern that the planned realignment of the channel's entrance closer to the Island, along with the channel's deepening and widening, would exacerbate these effects. The Village informed the Corps that it would oppose the project and consider legal action unless "it received written agreement from the Corps that the project would include sand management and [beach] protection measures or otherwise would be constructed and operated in a manner so as not to adversely impact Bald Head Island or, if the project caused adverse impacts, the project would be modified and the impacts would be corrected." During this period, as the Village alleges, it entered into negotiations with the Corps and the North Carolina Department of Environment and Natural Resources "in an effort to reach agreement on . . . measures that would protect Bald Head Island or address project impacts," and these negotiations resulted in the issuance of two letters, one from U.S. Army District Engineer Colonel James W. DeLony, dated June 9, 2000, and the other from Donna D. Moffitt, Director of North Carolina's Division of Coastal Management, dated June 15, 2000.

Col. DeLony's letter, which was addressed to the mayors of the Village of Bald Head Island, Caswell Beach, Oak Island, and Holden Beach, stated that it was designed "to bring everyone up to date on the status of our plan to place beach quality sand excavated for the project" on adjacent beaches. After addressing the placement of sand during the construction phase of the project, the letter stated that "the U.S. Army Corps of Engineers will conduct periodic maintenance dredging of the navigation channels" and that "[t]he

disposal of all beach quality dredged material will be accomplished in accordance with" the Environmental Assessment, its Sand Management Plan, and the Wilmington Harbor Monitoring Plan, reiterating that the disposal would follow the six-year cycle described in those plans. The letter added that the "disposal activities . . . will be at no cost to either community." Finally, DeLony's letter stated that the "Corps will conduct a monitoring program . . . as set out in the Wilmington Harbor Monitoring Plan" and that "[t]he Corps will use this monitoring data to evaluate and adjust the Sand Management Plan, as determined necessary, after coordination with interested parties." In this respect, the letter stated:

> If the Project causes significant adverse effects on adjacent beaches, the Corps and the Sponsor [North Carolina] will respond by adjusting the Sand Management Plan, after consultation with interested parties. If the Project causes significant adverse effects that cannot be dealt with by modifications to the Sand Management Plan, the Corps and the Sponsor will promptly seek and use their best efforts to implement appropriate corrective measures, such as additional nourishment, subject to consistency review.

The second letter, dated June 15, 2000, from Director Moffitt to Col. DeLony, summarizes the North Carolina Division of Coastal Management's review of the revised project, pursuant to its opportunity to comment on the project's conformance with state policies under the Coastal Zone Management Act, 16 U.S.C. §§ 1451-1466. Moffitt's letter stated:

> Based upon our review of the [Environmental Assessment] and the Corps of Engineers' response to comments, we do not disagree with your determination that the proposed construction and changes in harbor maintenance procedures are consistent with

the North Carolina Coastal Management Program to the maximum practicable, provided that the project is performed according to the [Environmental Assessment] (including the Sand Management Plan and other appendices) and the Corps' responses to comments from the [Environmental Assessment], and to Colonel DeLony's letter of June 9, 2000 (including attachments), and that the conditions below are met.

As relevant here, one of five listed conditions provided:

The placement, timing, costs, and amount of sand to be deposited on Bald Head Island, Caswell Beach, Oak Island, and Holden Beach, both during construction and future maintenance; monitoring; and response to impacts shall be in accordance with Col. DeLony's letter of June 9, 2000 . . . . If the towns, Corps, and project sponsor's representative mutually agree to modifications to the [Sand Management Plan] or Col. DeLony's June 9, 2000 letter, those modifications shall be submitted to the North Carolina Division of Coastal Management for a determination of whether another consistency review is necessary on the modifications.

In August 2000, about six months after the issuance of the Environmental Assessment for the revisions to the project, the Corps issued a Finding of No Significant Impact ("FONSI") (which obviated the need for an Environmental Impact Statement), concluding that the modifications "will not significantly affect the quality of the human environment." The FONSI also stated that the Corps "will comply with the conditions indicated in [Moffitt's] letter."

On September 20, 2000, the Corps formally approved the proposed revisions to the Wilmington Harbor Project, and construction commenced in December 2000. Consistent with

the plan, beach-quality sand that was dredged during the widening and deepening of the channel was placed on Bald Head Island during the summer of 2001.

Following completion of the project in 2002, the Corps also performed maintenance dredging during the winters of 2004-2005, 2006-2007, and 2008-2009. The sand dredged during the first two of those maintenance operations was placed on Bald Head Island, and the sand from the third was placed on Oak Island. But as the winter of 2010-2011 approached, the Corps informed the Village of Bald Island that the Corps' maintenance for that winter would have to be curtailed for budgetary reasons. It reported that it "ha[d] sufficient funding to dredge a portion of the Channel [that winter], but [did] not have the funding for dredging the portion of the Channel nearest Bald Head Island or for disposing of beach-quality sand onto Bald Head Island beaches."

In response to the Corps' notice, the Village of Bald Island commenced this action against the Corps, several of its officers, and the United States, and the Towns of Caswell Beach and Oak Island subsequently intervened as defendants.[1] The complaint alleged that the Corps had breached its commitments regarding how it would implement the Wilmington Harbor Project, as revised. In particular, it claimed that the Corps had breached (1) a commitment to deposit beach-quality sand from maintenance dredging on the adjacent beaches every two years for the life of the project; (2) a commitment to prevent the project from causing long-term harm to the adjacent beaches; (3) a commitment to adjust the Sand Management Plan if the project caused significant adverse effects to the adjacent beaches; (4) a commitment to take

---

[1]The Town of Caswell Beach and the Town of Oak Island intervened *as defendants*, but they admitted virtually all of the allegations in the Village's complaint. They apparently chose to join as defendants to claim competing relief. On appeal, however, the Towns support the positions taken by the Village, except with respect to Counts VII and VIII.

additional remedial steps if there were significant adverse effects that could not be dealt with by modifying the Sand Management Plan; and (5) a commitment that the Village would bear no cost for the disposal of beach-quality sand on its beaches. The claims were stated in eight counts, six of which relied on the APA, alleging that the Corps violated the National Environmental Policy Act and its implementing regulations (Count I); the Coastal Zone Management Act (Count II); the Rivers and Harbors Act (Count III); Corps Regulation 33 C.F.R. § 337.10 (Count IV); and contract rights with respect to the commitments stated in the DeLony and Moffitt letters (Counts V and VI). Counts VII and VIII alleged that the DeLony and Moffitt letters constituted "maritime contracts" that the Corps had breached. For relief, the complaint sought declaratory and injunctive relief, including an order of specific performance requiring the Corps to comply with the commitments it had made to the Village and Towns.

On the Corps' motion to dismiss, the district court entered an order, dated November 14, 2011, dismissing the complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction. *Village of Bald Head Island v. U.S. Army Corps of Eng'rs*, 833 F. Supp. 2d 524 (E.D.N.C. 2011). With respect to the Village's APA claims, the court concluded that "[i]mplementation or continued operation of a project [was] not . . . federal agency action," *id.* at 532, and that "[e]ven assuming, *arguendo*, that Plaintiff ha[d] in fact alleged agency action, Plaintiff ha[d] failed to show that any of the alleged agency actions [were] final agency actions that might confer jurisdiction on the Court," *id.* at 531. The court also concluded that the Village did not justify any claim under the provision of the APA that allows a court to compel "agency action that was unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), because none of the project's "documents create[d] an independent duty on the Corps to dredge the Inner Ocean bar according to a particular schedule in order to deposit sand on the neighboring beaches." *Village of Bald Head Island*, 833 F. Supp. 2d at 532. Finally, the

court determined that it did not have admiralty jurisdiction over the contract claims, concluding that the alleged contracts were not "maritime contracts" that would be subject to admiralty jurisdiction. *Id.* at 534-35.

From the district court's judgment, the Village and intervening Towns filed this appeal.

II

The Village contends that the district court erred in concluding that the Village's APA claims do not challenge a "final agency action" that is subject to judicial review under the APA. It maintains that there are two lenses through which to view the "agency action" at issue in this case. First, as it explains, the Corps' "physical activities in the field"—its implementation of the project by relocating, widening, and deepening the channel without also performing specified maintenance commitments designed to protect the adjacent beaches—constitute "agency action" that is "final" and hence subject to judicial review under the APA. *See* 5 U.S.C. §§ 702, 704. Alternatively, the Village claims that the Corps' failure to perform the beach-protection commitments constitutes a "failure to act," which amounts to the type of agency inaction that is subject to judicial review under the APA. *See id.* § 706(1). The Village admonishes that, without judicial review of such agency action or inaction, federal agencies will be left unaccountable for "implement[ing] a project differently from the plans, promises, and conditions generated during the pre-project environmental review."

The Corps contends that the district court correctly concluded that project implementation is not final agency action within the meaning of the APA. It also contends that the Village has not identified a *discrete* agency action that the Corps was *required to take* but failed to perform, as required for judicial review of an agency's failure to act under the APA. *See Norton v. Southern Utah Wilderness Alliance* ("*SUWA*"),

542 U.S. 55, 64 (2004). It argues that allowing "judicial review of the Village's claims would place a burden on courts to manage ongoing agency actions and would eviscerate Congress' carefully crafted scheme for judicial review."

Section 704 of the APA provides that *final agency action* is subject to judicial review, 5 U.S.C. § 704, and "agency action" is defined to "include[ ] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," *id.* § 551(13). The term "action" as used in the APA is a term of art that does not include all conduct such as, for example, constructing a building, operating a program, or performing a contract. Rather, the APA's definition of agency action focuses on an agency's *determination* of rights and obligations, *see Bennett v. Spear*, 520 U.S. 154, 177-78 (1997), whether by rule, order, license, sanction, relief, or similar action. The term is similar in concept to the meaning of "final decision" as used in describing the appealability of court orders. *See, e.g.*, 28 U.S.C. § 1291.

In this case, the Corps formally approved the revisions to the Wilmington Harbor Project in September 2000, and the revised project included the Corps' plans on how it would make beneficial use of the sand recovered from periodic maintenance dredging by depositing it on the neighboring beaches. That *approval* was a "determination" that surely amounted to "agency action." But thereafter, over the course of ten years, the Corps *performed* the work that had been approved in September 2000. The Village does not challenge the *approval* of the project; rather it challenges the Corps' *performance* of it, particularly focusing on a period in 2010. It commenced this action to challenge the adequacy of the performance and to require the Corps to do what it had undertaken to do when approving the project. Essentially, the Village sued the Corps for failing to adequately protect and renourish its beaches. While that alleged failure was a failure to take "action" in its broadest sense, it was not a determination—*i.e.*, a "rule, order, license, sanction, relief, or

the equivalent"—that is "action" as used in the APA. 5 U.S.C. § 551(13).

Moreover, the Corps' performance in maintaining the Wilmington Harbor Project was not action that was circumscribed and discrete. "Agency action" not only has a limited meaning, but it also must be "circumscribed [and] discrete," as those characteristics are inherent in the APA's enumeration of the categories of agency action subject to judicial review—*i.e.*, rule, order, license, sanction, or relief. *SUWA*, 542 U.S. at 62. As the *SUWA* Court explained, limiting judicial review to *discrete* agency action "precludes . . . broad programmatic attack[s]," *id.* at 64, and helps ensure that courts are not injected "into day-to-day agency management," *id.* at 67. By contrast, were a court to review the Corps' performance to determine whether the project here had caused "significant adverse effects on adjacent beaches," whether those adverse effects could be addressed by modifying the Sand Management Plan, and whether they required additional "appropriate corrective measures," it would then be injecting itself into the role of monitoring whether the Corps had complied with vague, undefined corrective measures. The obvious inability for a court to function in such a day-to-day managerial role over agency operations is precisely the reason why the APA limits judicial review to discrete agency actions. *SUWA*, 542 U.S. at 62-64, 66-67.

The Village protests that it *is* challenging agency action that is circumscribed and discrete. It asserts that it is not "challenging a regional or nationwide dredging program for shipping channels" but, instead, the implementation of "a *specific* dredging project at a *specific* coastal site." Yet, by challenging the Corps' ongoing real world physical actions, even at a localized level, the Village is essentially "demand[ing] a general judicial review of the [Corps'] day-to-day operations" in maintaining the channel, the type of review the Supreme Court has explicitly held the APA does not authorize. *Lujan*

*v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990); *see also SUWA*, 542 U.S. at 64, 66-67.

We therefore conclude that the Corps' implementation of the Wilmington Harbor Project, including the ongoing periodic maintenance dredging and resulting nourishment of nearby beaches, does not constitute "agency action" within the meaning of the APA.

Section 704 of the APA *also* requires that "agency action," to be subject to judicial review, be "*final* agency action." 5 U.S.C. § 704 (emphasis added). The Village has not explained how its challenge to the ongoing maintenance of the channel can satisfy this finality requirement.

The Supreme Court has held that "[a]s a general matter, two conditions must be satisfied for agency action to be 'final.'" *Bennett*, 520 U.S. at 177. "First, the action must mark the consummation of the agency's decisionmaking process— it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined or from which legal consequences will flow." *Id.* at 177-78 (internal quotation marks and citations omitted); *see also Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) ("The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties"). Here, the Corps made a *final* determination for purposes of the APA when it announced formal approval of the revised project in September 2000. That approval, not the Corps' subsequent activities in carrying it out, was the final agency action. *See Bennett*, 520 U.S. at 177-78. Thus, in the context of this case, "project implementation" is neither "agency action" nor "final" agency action subject to judicial review under the APA.

The Village contends, as an alternative argument, that the Corps' "failure to act" consistent with its commitments to

maintain and protect the beaches adjacent to the channel is subject to judicial review under 5 U.S.C. § 706(1), which provides that a "reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." But, again, the APA's use of the term "agency action" in § 706(1) limits judicial review to discrete determinations of rights and obligations. *See SUWA*, 542 U.S. at 62-63; *Bennett*, 520 U.S. at 177-78. As the *SUWA* Court explained, the term "failure to act" is "properly understood as a failure to take an *agency action*— that is, a failure to take one of the agency actions (including their equivalents) earlier defined in § 551(13)." 542 U.S. at 62. The Court therefore noted that the term "'failure to act' is properly understood to be limited, as are the other items in § 551(13), to a *discrete* action," providing as examples "the failure to promulgate a rule or take some decision by statutory deadline." *Id.* at 63.

Moreover, § 706(1) only authorizes the compulsion of agency action *that is legally required*. *SUWA*, 542 U.S. at 63. In this sense, the Court explained, § 706(1) is like the mandamus remedy, "empower[ing] a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing *how* it shall act.'" *Id.* at 64 (quoting Attorney General's Manual on the Administrative Procedure Act 108 (1947)). Thus, it concluded, "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it [was] *required to take*." *Id.*

More telling for the case before us, the *SUWA* Court applied that principle to circumstances similar to those here. The plaintiff there sought to compel the Bureau of Land Management to comply with certain "commitments" in its land use plans, which stated that a certain area "will be monitored and closed if warranted." *SUWA*, 542 U.S. at 67-68. The Court, however, was unwilling to "conclude that a statement in a plan that [the Bureau] 'will' take this, that, or the other action, is a binding commitment that can be compelled under

§ 706(1)"—"at least absent clear indication of binding commitment in the terms of the plan." *Id.* at 69.

Here, the Village would have us compel the Corps, under § 706(1), to perform "commitments" in DeLony's letter to deposit beach-quality sand on the adjacent beaches every two years for the life of the project. But, as in *SUWA*, the DeLony letter *does not commit* the Corps to do so. Rather, it outlined the *planned* disposal cycle that would follow periodic maintenance dredging "as called for" in the Sand Management Plan, and the Sand Management Plan makes clear that the plan to dredge every two years was the Corps' *projection* as to how often *dredging would be required*. These are hardly binding commitments; rather, they are statements of intent about future performance that are expressly conditioned on unknown conditions and wide-open judgments.

At bottom, we conclude that the Corps' continuing implementation of the Wilmington Harbor Project, as revised, does not constitute final agency action that is subject to judicial review under the APA. And even though "agency action" includes a "failure to act," such agency inaction can only be judicially compelled when it is a discrete "agency action" that the agency was required to take, which is not the type of claim the Village has presented. Accordingly, we affirm the district court's judgment dismissing the Village's APA claims.

## III

As to Counts VII and VIII for breach of contract, the Village contends that the DeLony and Moffitt letters created "maritime contracts" that the district court could enforce within its admiralty jurisdiction. In those counts, the Village sought an order of specific performance and other forms of equitable relief. The district court dismissed these counts, concluding that the letters were not *maritime* contracts and

that the court therefore lacked admiralty jurisdiction over them. *Village of Bald Head Island*, 833 F. Supp. 2d at 534-35.

We agree with the district court. In Count VII, the Village alleged that the DeLony letter of June 9, 2000, "constitute[d] a valid and enforceable express or implied contract between the Village and the Corps" to deposit the spoils of maintenance dredging on adjacent beaches every two years and to take other steps, as necessary, to prevent the project from causing the beaches harm. And in Count VIII, the Village similarly alleged that the Moffitt letter of June 15, 2000, constituted a valid and enforceable contract between the North Carolina Division of Coastal Management and the Corps for the same purposes. We conclude that such contracts—to nourish area beaches with dredged sand and to protect them from further erosion—are not maritime contracts.

The Supreme Court has recognized that the "boundaries of admiralty jurisdiction over contracts" are "conceptual rather than spatial," so that whether a contract qualifies as maritime "depends upon [its] nature and character"—namely, "whether it has reference to maritime service or maritime transactions." *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23-24 (2004) (internal quotation marks omitted). In this respect, the Court has explained that the "fundamental interest giving rise to maritime jurisdiction is the protection of maritime *commerce*" and that "[t]he conceptual approach vindicates that interest by focusing [the] inquiry on *whether the principal objective* of a contract is maritime commerce." *Id.* at 25 (second emphasis added) (internal quotation marks omitted).

It is clear that the "principal objective" of the contracts claimed by the Village was not "maritime commerce," but the preservation of area beaches. Indeed, the Village expressly alleged that it "entered into negotiations with the Corps and [the North Carolina Department of Environment and Natural Resources] in an effort to reach agreement on project conditions or measures that *would protect Bald Head Island or*

*address project impacts*." (Emphasis added). To be sure, the principal purpose of the Wilmington Harbor Project was to protect maritime commerce by ensuring that vessels could continue to access the port in Wilmington, North Carolina. But the alleged contracts—which were negotiated in response to the project in order to limit its impact on area beaches—were not designed to protect or engage in maritime commerce. Rather, they were sought to serve the recreational and aesthetic interests of the Village, as well as the property interests of property owners in the Village. Because the alleged contracts were not maritime contracts, the Village could not invoke the district court's admiralty jurisdiction.[2]

Moreover, while we conclude that the contracts alleged in Counts VII and VIII were not maritime contracts, we have also concluded, as discussed above in connection with the Village's APA claims, that the negotiations between the Village and the Corps did not result in "binding commitments" that could be contractually enforced. *See ante* at 16.

---

[2]It is also far from clear that the Village could successfully invoke the court's admiralty jurisdiction *only* to achieve equitable relief. Historically, it was understood that admiralty courts could not grant equitable relief. *See Rea v. The Eclipse*, 135 U.S. 599, 608 (1890) (discussing the limited power of admiralty courts). The Supreme Court in 1950, however, recognized that equitable relief may be granted in admiralty. *See Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684, 691-92 (1950) ("We find no restriction upon admiralty by chancery so unrelenting as to bar the grant of any equitable relief even when that relief is subsidiary to issues wholly within admiralty jurisdiction"). Citing this language and Congress' extension of the Federal Rules of Civil Procedure to admiralty cases in 1966, the First Circuit has held that "where equitable relief is otherwise proper under usual principles, it will not be denied on the ground that the court is sitting in admiralty." *Pino v. Protection Maritime Ins. Co.*, 599 F.2d 10, 16 (1st Cir. 1979). Nonetheless, the Court in *Swift & Co. Packers* still held to the proposition that "a court of admiralty will not enforce *an independent equitable claim* merely because it pertains to maritime property." 339 U.S. at 690 (emphasis added). Because of our conclusion that the alleged contracts are not maritime contracts, we need not resolve whether a court exercising admiralty jurisdiction may hear claims seeking only equitable relief.

We therefore affirm the district court's judgment dismissing the Village's breach of maritime contract claims for lack of jurisdiction.

*AFFIRMED*