**WILDEARTH GUARDIANS, et al, Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF JUSTICE, Defendant.**

**CV-13-392-TUC DCB**

United States District Court, D. Arizona.

Signed 07/27/2015

Judith Bella Calman, Attorney at Law, Albuquerque, NM, Steven Charles Sugarman, Steven Sugarman, Cerrillos, NM, for Plaintiffs.

Kevin William McArdle, U.S. Dept of Justice, Washington, DC, for Defendant.

## ORDER

David C. Bury, United States District Judge

The Court denies the Motion to Dismiss and allows Plaintiffs to file a Second Amended Complaint to conform the pleading to the evidence, with Defendant to answer thereafter.

Plaintiffs, WildEarth Guardians and New Mexico Wilderness Alliance, challenge a United States Department of Justice (DOJ) litigation policy: the "McKittrick Policy." In *United States v. McKittrick*, 142 F.3d 1170, 1177 (9th Cir. 1998), the Ninth Circuit Court of Appeals determined that the knowledge element for the criminal misdemeanor offense of "taking" an endangered species was: the defendant knew he was shooting an animal, and the animal shot was a Mexican gray wolf; "McKittrick need not have known he was shooting a wolf to 'knowingly violate[ ]' the regulation protecting the experimental population" *Id.* According to the court, Congress changed the wording of 16 U.S.C. 1540(b)(1) in 1978 from "willfully" to "knowingly," making the offense a general rather than a specific intent crime. *Id.*

McKittrick, convicted on this instruction, petitioned for a writ of certiorari and the Government responded that it would no longer use the general knowledge instruction. The Supreme Court denied certiorari, and on February 12, 1999, the Defendant distributed to all Assistant United States Attorneys a policy statement that it would no longer use the *mens rea* knowledge instruction approved in *McKittrick*. Instead, federal prosecutors request a specific intent instruction requiring the Government to prove beyond a reasonable doubt that the alleged shooter knew the biological identity of the animal at the time of the shooting.

It is undisputed that *McKittrick* remains good law. In 2000, the Ninth Circuit distinguished between the jury instruction for the general intent crime for illegally "taking" a Mexican gray wolf and *mens rea* required for the specific intent crime of removing an archeological resource. *States v. Lynch*, 233 F.3d 1139 (9th Cir.2000). The court described the difference as hinging on Congressional intent to halt and reverse extinction of the Mexican gray wolf and because the offense was a misdemeanor as compared to Congressional concern that only defendants who know or have reason to know that they are removing an archeological resource be found guilty of a felony violation of the Archeological Resources Protection Act (ARPA). *Id.* see also *United States v. Kapp*, 2003 WL 23162408 *9 (N.D.Ill. November 6, 2003) (finding Government met its burden where jury instruction allowed for presumption of knowledge where Government proved defendant knew animal he shot looked like a tiger or leopard), *United States v. Zak*, 486 F.Supp.2d 208, 218 n. 10 (D.Mass.2007) (finding reason obscure why government chose to focus on charge of shooting bald eagle in "wanton disregard for the consequence of his act" instead of simpler theory of "knowingly" taking eagle; where government charged both, the court is not bound by government's choice and may find defendant guilty of both where evidence satisfied *McKittrick* definition of knowingly).

Plaintiffs allege the McKittrick policy constitutes a violation of DOJ's responsibility under the Endangered Species Act (ESA) to take no action which may adversely affect a threatened species without first consulting with the Fish and Wildlife Service (FWS). Plaintiffs allege the McKit-

trick policy violates the Administrative Procedures Act (APA) because it is arbitrary, irrational, and an express policy that completely abdicates DOJ's responsibility to enforce the criminal penalties provision of the ESA. Plaintiffs allege that DOJ's ESA and APA violations adversely impact the sustainability of Mexican gray wolves because illegal killings are the biggest risk facing the reintroduction of the Mexican gray wolf.

 Plaintiffs assert that Congress designed the offense as a general intent crime to preclude a defense of mistake to ensure vigorous enforcement, which is necessary to ensure that " '[h]unters (and others) who might shoot a wolf are responsible to identify their targets before shooting.' " (Second Amended Complaint (SAC) (Doc. 23) ¶ 18) (quoting Final Rule, 63 Fed. Reg. 1758, 1759 (Jan 12, 1998)). The Final Rule adopted by the Fish and Wildlife Service (FWS) for the wolf reintroduction program provides: "Taking a wolf by shooting will not be considered unavoidable, accidental, or an unintentional take" that is immune from criminal prosecution under the ESA." 50 C.F.R. § 17.84(k)(15). Laws of the United States include both federal statutes and federal regulations. *Reid v. Johnson & Johnson*, 780 F.3d 952, 963–964 (2015). An agency, like FWS, charged with making such rules carrying the force of law is afforded deference in its interpretation of the statute it is charged with administering. *United States v. Smith*, 740 F.Supp.2d 1111, 1122 (D.Ariz.2010). Plaintiffs argue that the DOJ McKittrick policy violates the law passed by Congress and interpreted by FWS in the Final Rule for the Mexican gray wolf reintroduction and conservation program.

Defendant seeks dismissal, pursuant to Fed. R. Civ. P. 12(b), for three reasons: lack of jurisdictional standing, the claims are time barred, and the Second Amended Complaint (SAC) fails to state a claim.

Defendant's motion to dismiss asserts Plaintiffs lack Article III standing because a private citizen lacks standing to contest the prosecution or non-prosecution of another person. Defendant argues that the APA and ESA claims are barred by a six-year statute of limitations period because the challenged policy was adopted in 1999, with suit brought in 2013. Defendant argues Plaintiffs fail to state an APA claim because enforcement is a matter committed to agency discretion by law, especially non-enforcement decisions. Defendant argues Plaintiffs fail to state an ESA claim because ESA consultation provisions govern only agency action, not inaction.

## A. Rule 12(b)(1) and (6) Motion to Dismiss

 Defendant's Motion to Dismiss for lack of jurisdictional standing, pursuant to Rule 12(b)(1), attacks the SAC on its face. Plaintiff bears the burden to establish jurisdiction by a preponderance of the evidence. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). But unlike a motion to dismiss under Rule 12(b)(6), the Court is not limited under Rule 12(b)(1) to the allegations of the complaint, but may consider evidence outside the pleadings to resolve the question of whether it has jurisdiction to hear the case. *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir.1988).

Pursuant to Rule 12(b)(6), Defendant charges that the SAC fails to allege sufficient facts to state a claim for relief that is plausible on its face. To survive this motion, the SAC must contain "factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true even if doubtful in fact." *Bell Atlantic Corp. v. Twombly*, 550 U.S.

544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citations and internal quotations omitted). All factual allegations are taken as true and construed in the light most favorable to the nonmoving party, *Iolab Corp. v. Seaboard Sur. Co.*, 15 F.3d 1500, 1504 (9th Cir.1994), and all reasonable inferences are to be drawn in favor of that party as well. *Jacobson v. Hughes Aircraft*, 105 F.3d 1288, 1296 (9th Cir.1997). Dismissal is appropriate if the facts alleged do not state a claim that is " 'plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). Plausibility is not attained if the facts are merely consistent with his claims. *Twombly*, 550 U.S. at 545, 557, 127 S.Ct. 1955. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955).

### B. Article III Standing

■ Article III of the United States Constitution includes perhaps the most important jurisdictional doctrine: the "case" or "controversy" provision. *M–S–R Pub. Power Agency v. Bonneville Power Admin.*, 297 F.3d 833, 843 (9th Cir.2002). Federal jurisdiction hinges on there being an irreducible constitutional minimum of standing for all federal court plaintiffs, which requires a showing that (1) the plaintiff suffered an injury in fact, i.e., one that is sufficiently concrete and particularized and actual or imminent, not conjectural or hypothetical, (2) the injury is fairly traceable to the challenged conduct, and (3) the injury is likely to be redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130, *Monsanto Co. v. Seed Farms*, 561 U.S. 139, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010), *see also Bates v. Unit-ed Parcel Serv.*, 511 F.3d 974, 985 (9th Cir.2007).

■ The doctrine limits the role of the judiciary in our dual system of government. It ensures the separation of powers by keeping the judiciary from usurping the powers of the other two branches of the federal government: the legislative and executive branches. Defendant argues that these citizen-plaintiffs lack standing as a matter of law to contest the policies of the prosecuting authority, the DOJ, because they are neither prosecuted nor threatened with prosecution. *Linda R.S. v. Richard D.*, 410 U.S. 614, 619, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973); *Leeke v. Timmerman*, 454 U.S. 83, 86–87, 102 S.Ct. 69, 70 L.Ed.2d 65 (1981). Additionally, Defendant argues that, here, the alleged injury is not fairly traceable to any agency misconduct because wolf shootings are caused by the misconduct of some third party. *Washington Envir. Council v. Bellon*, 732 F.3d 1131, 1141 (9th Cir.2013) (citing *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130); (*Association of Public Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 953 (9th Cir.2013)) (citing *Bennett v. Spear*, 520 U.S. 154, 169, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)).

In *Linda R.S.*, the Supreme Court considered whether the mother of an illegitimate child had standing to seek an injunction forbidding the district attorney from declining to prosecute the alleged father for violating the State's criminal "deadbeat" parent statute where the State interpreted the statute as only applying to parents of legitimate children. The Court held that because the criminal statute did not follow the contempt model allowing for release of the father if he made the support payment to the mother, the injunction would result in jailing the child's father, not payment to the mother. The Court

reasoned that, therefore, payment to the mother for child support resulting from any threat of prosecution was at best only speculative. The Court found that in American jurisprudence a private citizen lacks a judicially cognizable interest in the prosecution or non-prosecution of another. Given this special status of criminal prosecutions, the Court held the mother failed to show a direct nexus between her interests and the enforcement of the State's criminal laws, and she lacked standing. *Linda R.S.*, 410 U.S. at 619, 93 S.Ct. 1146.

The Defendant cannot rely on what is a generalized statement of the law in *Linda R.S.*, about American jurisprudence, which is: "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Linda R.S.*, 410 U.S. at 619, 93 S.Ct. 1146 (citing *Younger v. Harris*, 401 U.S. 37, 42, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Bailey v. Patterson*, 369 U.S. 31, 33, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962); *Poe v. Ullman*, 367 U.S. 497, 501, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961)). Under *Linda R.S.*, the Court must consider the special status afforded prosecutorial discretion in American jurisprudence and whether Plaintiffs can show a direct nexus between the Plaintiffs' interests and the criminal law, 16 U.S.C. § 1540(b)(1).

■ Defendant argues that even if the Court is not persuaded that *Linda R.S.* is a *per se* bar to standing, "Plaintiffs cannot establish the causation and redressability elements of standing." (MD (Doc. 24) at 7.) The Defendant relies on " 'the Executive Branch's exclusive authority and absolute discretion to decide whether to prosecute a case.' " *Id.* at 10 (quoting *United States v. Nixon*, 418 U.S. 683, 693, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)). The courts " 'are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over

criminal prosecutions.' " *Id.* at 13 (quoting *United States v. Cox*, 342 F.2d 167, 171 (5th Cir.1965)). In other words, the Defendant argues there is no redressability because the Court may not interfere with the DOJ's discretionary power to prosecute or not prosecute a shooter for violating 16 U.S.C. 1540(b)(1) based on whether <u>the shooter knew</u> the biological identity of the animal at the time of the shooting.

■ Defendant argues that Plaintiffs allege an injury caused by third-party shooters, and to state a claim Plaintiffs must allege that the McKittrick policy has a determinative and coercive effect upon wolf killers, who are directly harming the Plaintiffs' interests. (MD (Doc. 24) at 8.) Plaintiffs do make such allegations. (Response (Doc. 27) at 12-14, Exs. 3-5; SAC (Doc. 23) ¶¶ 77, 83, 84, 96). The Defendant charges the causal chain is weak because it involves numerous third parties whose independent decisions would collectively have to be deterred. Defendant is wrong. Even Congress and FWS recognize the necessary coercive effect of the general intent offense to protect the Mexican gray wolf.

This is not a case like *Bellon*, where plaintiffs argued only a tentative and weak causal link between the global warming and the failure to curb greenhouse emissions from a single oil refinery or even all five refineries in Washington. Here, the number of Mexican gray wolves is very small. In 1970, the last Mexican gray wolf living in the wild was killed in Arizona. In 1998, eleven wolves were released, with five being illegally shot and killed. The original goal was to have 100 wolves in the wild by 2006, but the most recent count reflects only 83 wolves roaming the Blue Range Wolf Recovery Area, with 55% of the wolf mortality rate being due to illegal killings. Dissuading illegal shootings in this small Mexican gray wolf population is sig-

nificant to the success of the reintroduction program.

■ Plaintiff presents evidence from FWS, memorialized in the Final Rule and a 2010 "Mexican Wolf Conservation Assessment," that vigorous enforcement is the cornerstone to preventing illegal killings which is the single biggest threat to the Mexican gray wolf reintroduction program. As the agency charged with interpreting the ESA, FWS' construction and interpretation of the wolf reintroduction program is entitled to deference, with considerable weight being accorded to its construction of the statutory scheme it is entrusted to administer. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), *Smith*, 740 F.Supp.2d at 1122. The FWS' interpretation is persuasive because it coincides with Congress' amendment in 1978 to clarify that the ESA criminal enforcement provisions should include the general intent crime, 16 U.S.C. § 1540(b)(1). 1978 U.S.C.C.A.N. 6453, 9476.

The McKittrick policy negates the coercive and deterrent effects of the general intent offense statute, and " 'the loss of this deterrent leads to high levels of illegal shootings, and to a corresponding threat to the success of the Mexican gray wolf reintroduction program.' " (Response (Doc. 27) at 6 (quoting SAC (Doc. 23) ¶ 96)); *see also* (SAC ¶¶ 20, 25, 75, 89-96 (alleging on-going application of McKittrick policy results in extraordinary number of illegal killings), ¶ 94 (relying on 2010 Mexican Wolf Conserv. Assessment stating illegal shooting is one of the primary threats hindering biological progress), ¶¶ 83-84 (Arizona Dept. of Game and Fish criticizing McKittrick policy for preventing enforcement and change is necessary to reduce illegal killings), ¶ 77; Ex. 3 (Director of FWS expressing opinion that McKittrick policy

precludes enforcement of ESA section 9 and failure to change McKittrick policy "will result in little or no protection for this Nation's most critically endangered species"); Ex. 4 (internal FWS memo reporting that 2 years of McKittrick policy has rendered ESA prohibitions unenforceable and made it more difficult to pursue charges in cases involving killing); (SAC (Doc. 23) ¶¶ 83-84); Ex. 5 (Az Dept. FWS describing as necessary to reduce killings a change in McKittrick policy to make criminal prosecutions more feasible)).

It is undisputed that Defendant has the authority to bring enforcement actions against all shooters, including those who did not know the biological identity of the animal. *McKittrick*, 142 F.3d at 1177. This more vigorous enforcement program was designed by Congress and FWS to reduce illegal shootings by making hunters responsible for identifying the animals they shoot in order to ensure a successful Mexican gray wolf conservation and reintroduction program. 16 U.S.C. § 1540(b)(1); Final Rule 16 Fed. Reg. 1758–1759 (Jan. 12, 1998); 50 C.F.R. § 17.84(k)(15). Both Congress and FWS believed the natural consequence of a vigorous enforcement policy would be a reduction in illegal shootings. The reverse, as alleged by Plaintiffs, is enough to establish standing because the causation prong is satisfied if a plaintiff alleges that injury-causing third party action is "the natural consequence" of the challenged government action. *Wilderness Society v. Griles*, 824 F.2d 4, 17 (D.C.Cir. 1987).

The Court finds that Plaintiffs have standing to bring this action. Plaintiffs allege that their members seek to protect and restore wildlife and wild places and also frequently recreate in the national forests of Arizona and New Mexico and enjoy hearing and seeing the wolf in the wild, therefore, Plaintiffs have an interest

in the continued survival of the Mexican gray wolf and in the success of the ongoing Mexican gray wolf reintroduction program. (SAC (Doc. 23) ¶¶ 32-33.) The Plaintiffs allege specific immediate concrete injury to the aesthetic and recreational value of the national forests of Arizona and New Mexico because the Mexican gray wolf populations have been reduced by the McKittrick policy. Plaintiffs allege concrete and actual future injury because the McKittrick policy jeopardizes the future success of the Mexican gray wolf conservation and reintroduction program. (Response (Doc. 27) at 4); (SAC (Doc. 23) ¶¶ 10, 13, 17-19.)

The Court finds the Plaintiffs allege a cause of action causally linked and fairly traceable to the McKittrick policy because it negates the coercive and deterrent effect of the general intent crime formulated by Congress and the vigorous enforcement plan designed by FWS in the Final Rule to prevent illegal shootings of Mexican gray wolves. In assessing redressability, the Court assumes that the Plaintiff's claim has legal merit. *Bonnichsen v. United States*, 367 F.3d 864, 873 (9th Cir.2004). In other words, if the Court has jurisdiction to grant Plaintiffs a favorable ruling, Plaintiffs' injury would be redressed because DOJ would abandon the McKittrick policy.

■■■■ The harder question is whether this Court has jurisdiction to afford Plaintiffs the relief they seek. Defendant asserts the Plaintiffs lack standing because the constitutional separation of powers precludes judicial interference with the Executive Branch's exclusive authority and absolute discretion to prosecute or not prosecute a case. (MD (Doc. 24) at 7 (relying on *Nixon*, 418 U.S. at 693, 94 S.Ct. 3090)), (Reply (Doc. 28) at 2-3) (citing *United States v. Canori,* 737 F.3d 181, 184-85 (2nd Cir.2013) (despite DOJ policy

against prosecuting federal marijuana offense, marijuana remains illegal under federal law; DOJ may prioritize types of prosecutions); *United States v. Giannattasio*, 979 F.2d 98, 100 (7th Cir.1992) (finding no judicial authority to tell prosecutors which crimes to prosecute or when to do so), *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (explaining Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case); *United States v. Olson*, 504 F.2d 1222, 1225 (9th Cir.1974) separation of powers, courts are not to interfere with free exercise of prosecutorial discretion of United States attorneys), *United States v Banuelos–Rodriguez*, 215 F.3d 969, 976 (9th Cir.2000 (en banc) (same)). The courts may not review even a decision to not prosecute a crime based on the prosecutor's belief that the law will not sustain a conviction. *ICC v. Brotherhood of Locomotive Eng'rs*, 482 U.S. 270, 283, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987). And, the judiciary may not review the Government's attorney's alleged failure to adequately fulfill her obligation to enforce the country's laws where some enforcement exists. *State of California v. United States*, 104 F.3d 1086, 1094 (9th Cir.1997) (finding Attorney General did not abdicate statutory responsibilities by not instituting deportation proceedings against aliens convicted of aggravated felonies where she enforced deportation laws where aliens were serious repeat offenders).

■■■■ Plaintiffs assert that, here, the DOJ has abdicated its statutory responsibilities. Plaintiffs assert, what one court has referred to as, "abdication standing," which exists when an agency's failure to act is so extreme as to abdicate its duty. *Texas v. United States*, 787 F.3d 733, 745, 771 (Tex.2015). And, the Court has jurisdiction to determine whether the agency

exceeded its statutory power, *Heckler v. Chaney*, 470 U.S. 821, 832, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). The Court finds Article III standing exists, but for Defendant's assertion of prosecutorial discretion. Defendant also relies on prosecutorial discretion to challenge the Plaintiffs' substantive claims. The Court, therefore, addresses the question of prosecutorial discretion in the context of Defendant's assertion that Plaintiffs fail to state a claim for relief.

## C. Failure to State APA Claim: Presumption of Non-Reviewability

The Supreme Court in *Heckler*, 470 U.S. at 831, 105 S.Ct. 1649, held "that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." In *Heckler*, a group of prisoners sought to compel the FDA to initiate an enforcement action under the Food, Drug and Cosmetic Act (FDCA) with respect to the importation of drugs used for capital punishment. The Court considered the APA's comprehensive provisions for judicial review of "agency actions," contained in 5 U.S.C. §§ 701-706, which provide: A person "adversely affected or aggrieved" by agency action, including a "failure to act," is entitled to "judicial review thereof," as long as the action is a "final agency action for which there is no other adequate remedy in a court." *Id.* at 828, 105 S.Ct. 1649 (citing §§ 702, 704).

Noting this creates a presumption of reviewability under the APA, the Court considered section 701(a)(2) of the APA, which creates the narrow exception to reviewability for actions committed to agency discretion. Another narrow exception to reviewability exists under section 701(a)(1) when Congress expressly limits agency discretion. *Heckler* addressed section

701(a)(2), which is the section at issue here.

Section 701(a)(2) applies when a statute is so broadly drafted that there is no law for the Court to apply. Then the agency has absolute discretion to act because there is no clear standard by which to assess the agency's exercise of its discretionary authority. In *Heckler*, the Court found a presumption against reviewability over an agency's decision to not take an enforcement action. The Court did not extend the presumption of non-reviewability to enforcement actions because when "an agency does act to enforce, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner." *Heckler*, 470 U.S. at 832, 105 S.Ct. 1649.

The Court offered the following reasons for the presumption of non-reviewability over non-enforcement decisions, as follows: 1) the " 'complicated balancing of a number of factors which are peculiarly within [an agency's] expertise,' including the decisions of 'whether a violation has occurred' and how to allocate agency resources; 2) a decision not to enforce 'does not exercise [the agency's] coercive power over an individual's liberty or property rights' and that it 'shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict-a decision which has long been regarded as the special province of the Executive Branch,' and 3) non-enforcement decisions differ from actions to enforce in that for the latter the 'action itself provides a focus for judicial review.' " *Id.* at 831–32, 105 S.Ct. 1649. (quotations omitted).

The presumption is rebuttable if the substantive statute provides guidelines for the agency to follow in exercising its enforcement discretion. *Id.* at 832–33, 105 S.Ct. 1649. "Thus, in establishing this pre-

sumption in the APA, Congress did not set agencies free to disregard legislative direction in the statutory scheme that the agency administers." *Id. Heckler* left the door open regarding non-reviewability if an agency's refusal to initiate enforcement proceedings was based solely on the agency's belief that it lacked jurisdiction to take action or if the agency consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities. *Id.* at 833, 105 S.Ct. 1649 n. 4. In this case, Plaintiffs rely on the latter, "abdication of duty," path to reviewability. Plaintiffs rely on *Crowley Caribbean Transport, Inc. v. Pena*, 37 F.3d 671, (D.C.Cir.1994) to argue that the *Heckler* distinction between reviewability and non-reviewability hinges on whether the agency has made an individualized prosecutorial decision or a broadly applicable enforcement policy. (Response (Doc. 27) at 13.)

██ In the Ninth Circuit, a non-enforcement decision might be reviewable where the agency has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities. *See eg., State of California*, 104 F.3d 1086, 1094 (1997) (finding no abdication exception to presumption of non-reviewability of Attorney General's decision to only prosecute deported aliens who illegally reenter the country in cases where the aliens are serious repeat offenders); *Big Country Foods v. Alaska Bd. of Educ.*, 952 F.2d 1173, 1176–1177 (9th Cir.1992) (finding no abdication of statutory responsibility and, therefore, no standing to challenge Department of Agriculture decision to not follow federal procurement regulations to award federal school lunch program to minority contractor and instead make the award pursuant to Alaska preference statute). Plaintiffs do not offer, and the Court

has found none, any cases finding there has been an abdication of responsibility sufficient to rebut the presumption of non-reviewability over agency non-enforcement decisions.

The Defendant argues that the presumption is especially strong, here, because Plaintiffs ask the Court to exercise judicial power over the Attorney General and the United States Attorneys, who retain "broad discretion" to enforce the Nation's criminal laws. *United States v. Armstrong*, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (citing *Wayte*, 470 U.S. at 607, 105 S.Ct. 1524 and quoting *United States v. Goodwin*, 457 U.S. 368, 380 n. 11, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982)). This broad discretion rests on the recognition that judicial review is particularly ill suited in assessing such factors as: the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan. Moreover, judicial supervision in this area has systemic costs such as delaying criminal proceedings, threatening to chill law enforcement by subjecting the prosecutor's motives and decision making to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy. *Wayte*, 470 U.S. at 607, 105 S.Ct. 1524.

██ Prosecutorial discretion derives from Article II, including the Executive Power Clause, the Take Care Clause, the Oath of Office Clause, and the Pardon Clause. "The Executive's broad prosecutorial discretion and pardon powers illustrate a key point of the Constitution's separation of powers. One of the greatest unilateral powers a President possesses under the Constitution, at least in the domestic sphere, is the power to protect individual liberty by essentially under-enforcing fed-

eral statutes regulating private behavior— more precisely, the power either not to seek charges against violators of a federal law or to pardon violators of a federal law. The Framers saw the separation of the power to prosecute from the power to legislate as essential to preserving individual liberty...." *In re Aiken Cnty.*, 725 F.3d 255, 264 (D.C.Cir.2013) (*internal citations omitted*). After enacting a statute, Congress may not mandate the prosecution of violators of that statute, and "the remedy for executive branch abuses of the power to pardon or to decline to prosecute comes in the form of public disapproval, congressional 'retaliation' on other matters, or ultimately impeachment in cases of extreme abuse." *Id.* at 266.

■ In discussing the Executive Branch's power to prosecute, the Supreme Court has found it to not be "unfettered," and held it is subject to constitutional constraints. *Wayte*, 470 U.S. at 608, 105 S.Ct. 1524 (citing *United States v. Batchelder*, 442 U.S. 114, 125, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979)). But another way: " '[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.' " *Id.* at 607, 105 S.Ct. 1524 (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978)).

■ "So having said all of that," the court in *In re Aiken Cnty.*, nevertheless rejected the assertion of prosecutorial discretion by the Nuclear Regulatory Commission and found mandamus would likely be appropriate in the event the Commission failed to act on the Department of Energy's license application as mandate by the Nuclear Waste Policy Act. Prosecutorial discretion only encompasses the Executive Branch's power to decide whether to initiate charges for legal wrongdoing and to seek punishment, penalties, or sanctions. It does not include the power to disregard statutory obligations that apply to the Executive Branch. *In re Aiken Cnty.*, 725 F.3d at 266.

■ In other words, prosecutorial discretion encompasses discretion to not enforce a law or to prioritize partial enforcement of a law. Prosecutorial discretion does not encompass discretion to not follow a law imposing a mandate, or prohibition on the Executive Branch. Executive Branch prosecutorial discretion does not bar Plaintiffs' *ultra vires* challenge to the McKittrick policy or Plaintiffs' assertion that the McKittrick policy is an abdication of duties and responsibilities imposed upon the DOJ by the ESA.

**D. Rebutting the Presumption of Non-Reviewability.**

Plaintiffs' challenge fits within the door left open in *Heckler* because Plaintiffs allege the DOJ has formally expressed a general policy of non-enforcement: the McKittrick policy. See *People for the Ethical Treatment of Animals v. United States Dept. of Agriculture (PETA)*, 60 F.Supp.3d 14, 17–18 (D.C.Cir.2014) (citing *Crowley*, 37 F.3d at 676–77) (requiring plaintiff to identify concrete statement of general non-enforcement policy to obtain review). In *Heckler*, the court noted that in this type of situation the statute conferring authority on the agency might indicate that such decisions were not "committed to agency discretion." *Heckler*, 470 U.S. at 833 n. 4, 105 S.Ct. 1649.

In. *Cook v. Food & Drug Administration*, 733 F.3d 1 (D.C.Cir.2013), the District of Columbia Circuit again looked at the question from a group of prisoners challenging a 2011 FDA policy statement concerning the importation of thiopental

for the execution of state prisoners, wherein the FDA asserted it would neither approve nor review the use of lethal injections but would defer to law enforcement agencies and exercise its enforcement discretion not to review shipments of thiopental and to allow processing through Customs automated system for importation. *Id.* at 4. The FDA asserted it had absolute enforcement discretion, pursuant to 21 U.S.C.A. § 381(a), to refuse admission to any particular drug. The court in *Cook* made no mention of the distinction drawn in *Crowley* between an individualized prosecutorial decision and a general prosecutorial policy. In *Cook*, the court simply looked to whether Congress provided statutory provisions circumscribing the FDA's enforcement discretion. The court distinguished the *Cook* challenge to the challenge asserted in *Heckler*, with the difference being that the *Heckler* plaintiffs relied on the general enforcement provisions of the FDCA, 21 U.S.C.A. § 372, which *"authorized"* the Secretary to conduct examinations and investigations, and § 333, which provided "baldly that any person who violates the Act's substantive prohibitions 'shall be imprisoned ... or fined.'" *Id.* at 6.

In *Cook*, the FDA argued *Heckler* applied straightforwardly to § 381(a), which provided: "'[i]f it appears' an article offered for import violates a substantive prohibition of the FDCA then 'such article shall be refused admission.'" *Id.* at 6–7. The FDA argued "if it appears" meant that Congress gave the agency discretion to make a formal determination that a statutory obligation was violated and "shall be refused admission" provided for a permissive sanction. *Id.* at 7. The court looked at the statute, which expressly provided that the FDA shall furnish to Customs a list of registered establishments and request for samples of drugs offered for import that are manufactured in an unregistered establishment; that Customs in turn shall deliver to the FDA the requested samples, and if it appears from the examination of such samples or otherwise that a drug violates a substantive prohibition of the FDCA, then the drug shall be refused admission. *Id.* (citing 21 U.S.C. § 381(a)). The court found the statute challenged in *Cook* provided unambiguous enforcement guidelines, whereas discretion remained as determined in *Heckler* under the Act's general enforcement provisions which allowed the FDA to recommend or not any criminal prosecutions to the Attorney General for prosecution. *Id.*

■ The presumption of non-reviewability of an agency decision not to take an enforcement action can be rebutted by proof that Congress intended to limit an agency's enforcement discretion, "'either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue.'" *Big Country Foods*, 952 F.2d at 1176 (quoting *Heckler*, 470 U.S. at 833, 105 S.Ct. 1649). Alternatively, the presumption can be rebutted where the agency has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibility. *Id.* at 1177 (citing *Heckler*, 470 U.S. at 833 n. 4, 105 S.Ct. 1649). In the latter, the statute conferring authority on the agency might indicate that such decisions were not committed to agency discretion. *Heckler*, 470 U.S. at 833 n. 4, 105 S.Ct. 1649.

■ Either way, the Court looks to the statute to determine whether the presumption of non-reviewability has been rebutted. The Court can look "in the statute itself [or] in 'regulations promulgated by an administrative agency in carrying out its statutory mandate.'" *Crowley*, 37 F.3d at 677 (quoting *Center for Auto Safety v.*

*Dole,* 846 F.2d 1532, 1534 (D.C.Cir.1988)). The Court turns to the statutes at issue here: 16 U.S.C. § 1540(b)(1), the Final Rule, and the ESA.

First, Congress intentionally amended the offense provisions of the ESA in 1978 to adopt a stringent enforcement 3-tiered program, with a maximum strict liability fine of $1000 for each offense; a misdemeanor fine of $1000 for knowingly taking an endangered species like the Mexican gray wolf, and a felony offense for willful takings punishable by up to $10,000 and one-year in prison. *McKittrick,* 142 F.3d at 1177 (citing H.R. Rep. 95-1625 at 9457). The statute expressly provides for the affirmative defense of self-defense or defense of another. 16 U.S.C. § 1540(b)(3), but mistake or accident is not a defense to the misdemeanor charge of knowingly shooting a Mexican gray wolf, *McKittrick,* 142 F.3d at 1177. This does not, however, limit the DOJ's prosecutorial discretion to determine its charging policy, which it asserts is to charge violations where there is evidence of actual intent to shoot a Mexican gray wolf or for being in possession of a Mexican gray wolf. In other words, Congress' mandate that the offense be a general intent crime is binding, but it does not bind the Government to prosecute every violation.

Prosecutorial discretion does not include the power to disregard statutory obligations that apply to the Executive Branch. *In re Aiken County,* 725 F.3d at 266. Plaintiffs are correct that the Final Rule governing the Mexican gray wolf conservation program requires a vigorous prosecution component, specifically designed by Congress to reach even shootings done by mistake so that shooters have the responsibility to be sure of their targets, 50 C.F.R. 17.84(k)(15), and, defines an unintentional take as "not by poisoning or shooting," 50 C.F.R. 17.84(k)(3) (emphasis added).

Importantly, the offense statute the DOJ asserts it has discretion to enforce, pursuant to the McKittrick policy, is part of ESA's comprehensive scheme to protect endangered and threatened species. And, section 7(a)(1) of the ESA, 16 U.S.C. 1536(a)(1), imposes important obligations on all federal agencies, including the DOJ, to conserve listed species: to use their authorities to assure the survival of threatened and endangered species, to protect their critical habitats, and to promote the recovery of the species to the point at which they no longer require the protections of the ESA. To assure compliance with Section 7(a)(1), Section 7(a)(2) mandates a consultation process with the FWS to insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered or threatened species. 16 U.S.C. § 1536(a)(2). Section 7 duties are triggered whenever a federal agency proposes to take a discretionary action that "may affect" threatened and endangered species. An agency may not take a discretionary action that is arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law. 5 U.S.C. § 706(2)(A).

The term "action" is broadly construed to cover all federal agency actions and programs over which federal agencies exercise discretionary control. *Pacific Rivers Council v. Thomas,* 30 F.3d 1050, 1054–55 (9th Cir.1994). The Court finds that DOJ's actions, including the adoption of a formal discretionary non-enforcement policy, are subject to ESA guidelines. Choosing to not enforce 16 U.S.C.A. 1538(a)(1)(B), pursuant to the guidelines set out in the Final Rule interpreting 16 U.S.C. 1540(b)(1) is arguably an abdication of DOJ's duty under the ESA to

ensure that it uses its authority in furtherance of the purposes of ESA, i.e.—to protect the Mexican gray wolf. This is especially true, because Plaintiffs allege the DOJ failed to consult with FWS as mandated by ESA § 7(a)(2) when any action authorized, funded or carried out by it may affect a threatened and endangered species. The DOJ admittedly authorizes and carries out enforcement actions pursuant to the McKittrick policy, and as the Court found in its standing analysis, Plaintiffs allege a clear link between increased shootings and the McKittrick policy.

### E. Failure to State ESA Claim: No Final Agency Action

Defendant argues that only affirmative agency action is subject to ESA's consultation requirement, and, here, the Plaintiffs only allege inaction: DOJ's alleged unexercised enforcement authority or, alternatively stated, DOJ's decision not to enforce. (MD (Doc. 24) at 15-16.) Defendant is wrong. The Plaintiffs challenge the DOJ's actions of adopting and "carrying out" the McKittrick policy. (SAC (Doc. 23) ¶¶ 13, 99.) Plaintiffs assert the McKittrick policy is *ultra vires* [1] because it is more than a policy of non-enforcement or a policy which prioritizes enforcement actions. Expressly stated, the McKittrick policy requires prosecuting attorneys to request a jury instruction requiring specific intent instead of a jury instruction for a general intent offense. (MD (Doc. 24) at 15) (citing SAC (Doc. 23) ¶¶ 21, 64, 68, 100). The McKittrick policy goes beyond simply prioritizing cases for prosecution where the defendant knew the protected identity of the animal shot: the Mexican gray wolf. *Id.* The McKittrick policy rewrites the offense to include a *mens rea* of intent, which

requires the government to prove beyond a reasonable doubt that the defendant intended to shoot a Mexican gray wolf.

 Prosecutorial discretion does not extend to jury instructions. As Defendant correctly explained, American jurisprudence depends on separation of power between the three equal branches of our government. And, it is the province and duty of the courts to say what the law is. *Nixon*, 418 U.S. at 704–05, 94 S.Ct. 3090. Here, the law is a general intent crime, *McKittrick*, 142 F.3d at 1177, and the DOJ may not prosecute it as a specific intent crime. Plaintiffs state a cause of action under ESA because the DOJ's McKittrick policy is more than an exercise of prosecutorial discretion.

For the same reasons the Court found the Plaintiffs sufficiently alleged the McKittrick policy caused them direct and actual injury, the SAC sufficiently alleges facts to support Plaintiffs' assertion that the McKittrick policy is the legal or proximate cause of adverse effects on the Mexican gray wolf reintroduction and conservation programs.

The Court rejects the DOJ's assertion that consultation between the DOJ and FWS would be at odds with the purpose of section 7 consultations, which is "to obtain expert opinion of wildlife agencies to determine whether the action is likely to jeopardize a prudent alternative that will avoid the action's unfavorable impacts." (MD (Doc. 24) at 17) (quoting *Karuk Tribe of California v. United States Forest Service*, 681 F.3d 1006, 1020 (9th Cir.2012)). The Defendant argues that there is nothing for FWS biologists to weigh in on because the McKittrick policy is merely a question of law and prosecutorial discretion falling

---

1. Plaintiffs appear to use the term *"ultra vires"* to mean "exceeding the agency's statutory authority," *Wind River Min. Corp. v. United States,* 946 F.2d 710, 714 (9th Cir.1991) or "not otherwise in accordance with law," 5 U.S.C. § 706(2)(A).

within the exclusive purview of the Attorney General. The Court has already rejected DOJ's assertion of discretion to say what the law is by rewriting the statutory elements of an offense, and the Plaintiffs present evidence that FWS experts have already weighed in on the impact of the McKittrick policy on the Mexican gray wolf. (Response (Doc. 27) at 11) (citing SAC (Doc. 23) ¶¶ 77, 96), Exs. 3-5 (FWS employees stating opinion that McKittrick policy makes ESA prohibition on illegal killing protected species unenforceable and change in policy is necessary to reduce shootings of endangered Mexican wolves.)

The Court finds the Plaintiff's SAC states a claim for relief under the ESA because it charges that DOJ acted *ultra vires* by adopting the McKittrick policy without consulting with FWS as required under Section 7(a)(2) of the ESA regarding the impact of the McKittrick policy on the Mexican gray wolf recovery and conservation program.

The McKittrick policy meets the definition of a final action, which is an agency action that: 1) marks the consummation of the agency's decision-making process, and 2) by which rights or obligations have been determined, or from which legal consequences flow.

### F. Six Year Statute of Limitation:

■ Defendant correctly notes, "Plaintiffs' APA and ESA claims are subject to the six-year statute of limitations, 28 U.S.C. § 2401(a)." (MD (Doc. 24) at 10) (citing *Wind River Mining Corp. v. United States*, 946 F.2d 710, 713 (9th Cir.1991); *Coos Cnty. Bd. of Cnty. Comm'rs v. Kempthorne*, 531 F.3d 792, 812 n. 16 (9th Cir.2008)). " '[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues.' " *Id.* (quoting 28 U.S.C.

§ 2401(a)). " 'Because 28 U.S.C. § 2401 is a condition of the [Government's] waiver of sovereign immunity, courts are reluctant to interpret the statute of limitations in a manner that extends the waiver beyond that which Congress clearly intended.' " *Id.* (quoting *Sisseton–Wahpeton Sioux Tribe v. United States*, 895 F.2d 588, 592 (9th Cir.1990)).

■ Because the APA limits judicial review to lawsuits challenging discrete "final agency action," an APA claim will accrue on the date of the final agency action. *Id.* at 11 (citing *Harris v. FAA*, 353 F.3d 1006, 1009–10 (D.C.Cir.2004); *California Sea Urchin Comm'n v. Jacobson*, 2014 WL 948501, at *3 (C.D.Cal. Mar. 3, 2014)). Defendant is correct that the "Plaintiffs cannot circumvent the statute of limitations by purporting to challenge DOJ's 'ongoing implementation of the McKittrick policy as something distinct from the "adoption" of the Policy in 1999.' " (MD (Doc. 24) at 11 (quoting SAC (Doc. 23) ¶¶ 27, 44-45, 99, 101)). "First, an agency's 'ongoing implementation' of a prior decision is not itself a discrete 'final agency action' reviewable under the APA." *Id.* at 11–12 (citing *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 800–802 (9th Cir. 2013) (agency's "day-to-day operations that merely implement operational plans" were not themselves reviewable under APA); *Village of Bald Head v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193–95 (4th Cir. 2013) (same)).

Defendant argues that likewise, the ESA mandates consultation with FWS before an agency takes some affirmative agency action that affects a listed species, therefore, a failure-to-consult claim accrues on the date the "affirmative agency action" was allegedly taken in violation of the duty to consult. *Id.* (citing *Ctr. for Biological Diversity v. EPA*, No. 11–cv–00293–JCS, 2013 WL 1729573, at *22

(N.D.Cal. Apr. 22, 2013); *Ellis v. Bradbury*, 2014 WL 1569271, at *5, *14 (N.D.Cal. Apr. 18, 2014); *Sierra Club v. EPA*, 162 F.Supp.2d 406, 422 n. 26 (D.Md. 2001)). There is, however, a split in the circuit, with some courts relying on the District of Columbia, *Wilderness Society v. Norton*, 434 F.3d 584, 588 (D.C.Cir.2006), in ESA cases alleging a failure to perform a nondiscretionary duty. *Institute for Wildlife Protection v. United States FWS*, 2007 WL 4117978 at *5 (D.Or.2007). "[A]pplication of a statute of limitations to a claim of unreasonable delay is grossly inappropriate, in that it would mean that [FWS] could immunize its allegedly unreasonable delay from judicial review simply by extending that delay for six years." *Id.* Courts following this line of reasoning would conclude that each day the DOJ does not act to consult with FWS as required under the ESA constitutes a single, discrete violation of the statute. *Id.* at *6.

Defendant asserts that here, both the APA and ESA claims accrued when the DOJ adopted the McKittrick policy, which was either in November 1998 when DOJ informed the Supreme Court it would discontinue use of the jury instruction approved in *McKittrick* or when DOJ issued its memo on February 12, 1999 to its prosecution attorneys informing them of the McKittrick policy. SAC (Doc. 23) ¶¶ 64-68; Exs. A-B. "The SAC does not identify any [ ] 'further affirmative actions," (MD (Doc. 24) at 12), subsequent to the McKittrick policy being "implemented" when it was formally conveyed to U.S. Attorneys in February 1999, *id.* (citing SAC (Doc. 23) ¶ 69). "At that point, '[a]ll Department prosecutors [were] instructed not to request, and to object to, the use of knowledge instruction at issue in McKittrick.' *Id.* [ ]. There were no further 'implementing'

actions left to occur." (MD at 12) (citing Ex. B (Doc. 25): 1999 policy memo.) Defendant argues that because Plaintiffs' APA and ESA claims first accrued, at the latest, on February 12, 1999, and this action did not commence until May 30, 2013, over 14 years later, Plaintiffs' claims are time barred.

▪ Defendant does not concede that the statute of limitations period may be equitably tolled, but argues against it. The Court finds that the statute of limitations, pursuant to 28 U.S.C. 2401(a), is subject to equitable tolling in the context of an APA claim for judicial review. *See Mishewal Wappo Tribe of Alexander Valley v. Jewell*, 84 F.Supp.3d 930, 941–42 (9th Cir.2015) (applying equitable tolling, rejecting continuous violations doctrine), *see also Strich v. United States*, 793 F.Supp.2d 1238, 1245–46 (D.Colo.2011) (identifying Supreme Court precedent for equitable tolling of 2401(a) statute of limitations).

Defendant correctly asserts that the SAC fails to allege facts to support tolling the limitation period, but Plaintiffs submit affidavits in response to the Motion to Dismiss which amply support equitably tolling the statute of limitations period.[2] In both, long time activists affiliated with organizations dedicated to the protection and restoration of the Mexican gray wolf, who have been intimately involved in commenting on all agency decision-making process that relate to the wolves and managed by FWS, attest that they became increasingly concerned over the years with the high numbers of wolves being reported as illegally shot until in March of 2012, a Freedom of Information (FOIA) request revealed only six FWS investigatory files despite the FWS website reflecting 43 illegally shot Mexican gray wolves. After sev-

**2.** The Plaintiffs may file a Third Amended Complaint, pursuant to Fed. R. Civ. P. 15(a)(2), to allege facts to match the evidence presented in these affidavits.

eral more months of investigation, activists found a 2011 article from Lewis and Clark's Animal Law Journal, which explained the McKittrick policy's history and its adoption by DOJ. Plaintiffs believe this journal article is the only non-governmental publication about the McKittrick policy. (Response (Doc. 27), Ex. 7: Alman Decl. and Ex. 8: Keefover Decl.).

In Reply, Defendant submits a declaration from its attorney, who attests that the National Wildlife Federation (NWF), another environmental organization involved in efforts for the recovery of the grizzly bears and wolves, knew about and complained about the McKittrick policy in 2002 and 2004. (Reply (Doc. 29), Suppl. McArdle Decl.) Defendant asserts that Plaintiffs are "litigation-savvy" environmental groups so they should have known about the McKittrick policy, especially since it has been a matter of public record since 1998 when the Solicitor General filed its opposition to McKittrick's petition for certiorari.

The Court is not inclined to treat a responsive memorandum filed before the Supreme Court in response to a petition for certiorari the same as publication in the Federal Register, which is the well-established "legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance." *Shiny Rock Min. Corp. v. United States*, 906 F.2d 1362, 1364–65 (9th Cir.1990). And, the Court notes the DOJ informed the Supreme Court it would not be requesting the jury instruction at issue in McKittrick, it did not declare it would be seeking a specific intent jury instruction for the general intent offense.

As the proponent of equitable tolling, Plaintiffs must establish that they pursued their rights diligently and that some extraordinary circumstances stood in the way. *Mishewal Wappo Tribe*, 84 F.Supp.3d at 941–42. Diligence does not require an overzealous or extreme pursuit of any and every avenue of relief, but does require the effort that a reasonable person might be expected to deliver under his or her particular circumstances. *Id.* (citing *Doe v. Busby*, 661 F.3d 1001, 1015 (9th Cir.2011)).

Extraordinary circumstances include "situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass. *Id.* (citing *O'Donnell v. Vencor Inc.*, 465 F.3d 1063, 1068 (9th Cir.2006)).

The Court finds Plaintiffs acted diligently tracking illegal shootings of Mexican gray wolves, notice and comment opportunities related to the Mexican gray wolf, reviewed the Mexican Wolf Conservation Assessment of 2010, and finally submitted a FOIA request to FWS before discovering the McKittrick policy.

The Court finds the DOJ induced the Plaintiffs into allowing the filing deadline for challenging a final agency action by hiding the McKittrick policy behind an obscure directive in 1998-99 to DOJ prosecuting attorneys to not use the McKittrick jury instruction. The USA Bulletin to DOJ prosecuting attorneys does not even provide the alternative instruction to be used, but only directs attorneys to contact the Department of Justice for an approved instruction. (Response (Doc. 27), Ex. 1-6.) Plaintiffs did not sit on their rights but filed this action as soon as they discovered the final agency action.

Defendant focused on statute of limitation cases involving challenges to final agency actions which were unquestionably noticed to the public, such as being published in the Federal Register, and ignore that under federal law a cause of

action accrues when the plaintiff is aware of the wrong and can successfully bring a cause of action. *Mishewal Wappo Tribe*, 84 F.Supp.3d at 938 (citing *United States v. Kubrick*, 444 U.S. 111, 122, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979)) (generally, a claim subject to the § 2401(a) limitations period first accrues when the plaintiff comes into possession "of the critical facts that he has been hurt and who has inflicted the injury); *Acri v. Int'l Ass'n of Machinists & Aerospace Workers*, 781 F.2d 1393, 1396 (9th Cir.1986) ("Under federal law a cause of action accrues when the plaintiff is aware of the wrong and can successfully bring a cause of action."), *see also Muwekma Ohlone Tribe v. Salazar*, 813 F.Supp.2d 170, 190–91 (D.D.C.2011) (quoting *Spannaus v. United States Dept. of Justice*, 824 F.2d 52, 56 (D.C.Cir.1987)) ("The moment at which a cause of action first accrues within the meaning of Section 2401(a) is when 'the person challenging the agency action can institute and maintain a suit in court.'") Generally, this will be the date of the final agency action, but here, it is the date the Plaintiffs discovered the existence of the McKittrick policy which was in 2012.

■ The action was timely filed. Plaintiffs do not need to resort to equitable tolling nor do they need to depend on any *ultra vires* nature of their claim. In the Ninth Circuit, actions with continuing application may be challenged after a limitations period has expired where the theory is that the issuing agency acted in excess of its statutory authority. *Wind River Mining Corporation v. United States*, 946 F.2d 710 (1991).

In *Wind River*, the court distinguished the running of the statute of limitations period for procedural and facial challenges to regulations. Then, grounds for the challenge will usually be apparent to any interested citizen within six months following promulgation of the decision. In *Wind River*, in 1986-87 a mining company staked claims in an area designated in 1979 as a Wilderness Study Area (WSA), a "roadless" area of 5,000 or more acres, where mining is precluded. The mining company contended that the area was not roadless in 1979 and should not have been designated a WSA. The mining company argued the WSA adopted by the BLM in 1979 was *ultra vires* because it exceeded the BLM's authority which was limited to listing areas that were roadless. The court reasoned that such substantive challenges may not become apparent until the "old" agency action is applied to a citizen and that is when the six-year statute of limitation period begins to run. *Id.* at 714–16.

The Defendant argues that *Wind River* assumes a second agency action applying the "old" rule to a particular challenger. (Reply (Doc. 28) at 5) (citing *California Sea Urchin Comm'n v. Jacobson*, 2014 WL 948501 * 4 (Calif. March 3, 2014)). But the Ninth Circuit has applied *Wind River* to allow citizens to challenge construction in 2006 of a casino because the land had not been properly determined to be "Indian lands" in the Tribes 1993 gaming ordinance. *North County Community Alliance v. Salazar*, 573 F.3d 738 (9th Cir.2009). There was a second action by the agency when it granted a construction permit, but it was not taken in respect to the challenger-plaintiffs, who were citizens living in the neighborhood of the casino. The Ninth Circuit, nevertheless, applied the *Wind River* logic: that no one was likely to have discovered the agency acted beyond its authority until someone actually took an interest in it; the Alliance took an interest in 2006 when casino construction began. *Id.* at 743. Plaintiffs allege that they took an interest in the McKittrick policy after various wolf-studies and their own observations reflected a lack-luster enforcement program.

Plaintiffs' case fits within *Wind River* because the substantive challenge was not apparent until the interested Plaintiffs discovered the McKittrick policy as applied by the DOJ reaches beyond prosecutorial discretion and exceeds the DOJ's discretionary non-enforcement authority. The Court, however, finds that it does not need to consider *Wind River* because this is not a case where Plaintiffs had notice of the policy by publication in the Federal Register or otherwise. Plaintiffs' cause of action accrued when they became aware of the wrong; the six-year limitation period began to run in 2012 when Plaintiffs received responses to the FOIA request reflecting the existence of the McKittrick policy. The action was timely filed.

## G. Conclusion

Plaintiffs' claims survive the Defendant's Motion to Dismiss on all issues. Defendant shall file an Answer. The Plaintiffs have leave to file a Third Amended Complaint to add facts to reflect the evidence contained in the affidavits submitted as Exhibits 7-8.

Accordingly,

IT IS ORDERED that the Motion to Dismiss (Doc. 24) is DENIED.

IT IS FURTHER ORDERED that Plaintiffs may file a Third Amended Complaint within 21 days of the filing date of this Order to allege facts to match the evidence presented by affidavit in support of Plaintiffs' Response to the Motion to Dismiss.

IT IS FURTHER ORDERED that the Defendants shall file an Answer thereafter, and the Court shall set a Scheduling Conference.