State of SOUTH CAROLINA, Plaintiff,

v.

UNITED STATES; United States Department of Energy; Dr. Ernest Moniz, in his official Capacity as Secretary of Energy; National Nuclear Security Administration; and Lt. General Frank G. Klotz, in his official Capacity as Administrator of the National Nuclear Security Administration and Undersecretary for Nuclear Security, Defendants.

Civil Action No. 1:16–cv–00391–JMC

United States District Court, D. South Carolina, Aiken Division.

Signed 10/31/2016

Alan Wilson, Robert Dewayne Cook, Thomas Parkin C. Hunter, SC Attorney General's Office, Benjamin Parker Mustian, John William Roberts, Randy Lowell, Willoughby and Hoefer, Kenneth Paul Woodington, William Henry Davidson, II, Davidson Morrison and Lindemann, Columbia, SC, for Plaintiff.

Barbara Murcier Bowens, US Attorneys Office, Columbia, SC, Raphael Ortega Gomez, Spencer Elijah Wittman Amdur, US Department of Justice, Washington, DC, for Defendants.

## ORDER AND OPINION

J. MICHELLE CHILDS, United States District Court Judge

The State of South Carolina ("the State") filed a Complaint (ECF No. 1) alleging that Defendants United States, the United States Department of Energy ("DOE"), Dr. Ernest Moniz, the National Nuclear Security Administration ("NNSA"), and Lieutenant General Frank G. Klotz (collectively "Defendants") failed to adhere to statutory obligations within 50 U.S.C. § 2566. This matter is before the court pursuant to Defendants' Motion to Dismiss (ECF No. 17) the State's Complaint (ECF No. 1) for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and failure to state a claim for which relief may be granted under Fed R. Civ. P. 12(b)(6). For the following reasons, this court concludes that it lacks subject matter jurisdiction over one of the State's claims. However, because the court concludes that it has subject matter jurisdiction over the State's remaining claim, the court declines to rule on the substantive motion to dismiss as to the removal claim and, for the reasons that follow, **DIRECTS** the parties to submit further briefing.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Savannah River Site ("SRS") is a 310 square mile site encompassing parts of Aiken, Barnwell, and Allendale counties in South Carolina and is bordered on the west by the Savannah River and Georgia. (ECF No. 1 at 2.) SRS was constructed during the 1950s to produce basic materials, primarily plutonium, for weapons and other national defense missions. (*Id.* at 7.) Currently, the site's mission is dedicated to conducting research and development; converting highly enriched plutonium into materials suitable for commercial use in nuclear reactors; and storing plutonium

and uranium waste from around the world. (*Id.* at 7–10.) SRS also serves as the construction site for the MOX Facility.[1] (*Id.* at 7.) The State owns the property on which SRS is located. (*Id.* at 2.)

Defendant DOE oversees planning, coordination, support, and management of research and development programs, including functions related to nuclear weapons and establishment of policies regarding nuclear weapons. *See* 42 U.S.C.A. § 7112. Defendant Dr. Ernest Moniz, as the United States Secretary of Energy, is responsible for monitoring and assuring proper management of the DOE. *Id.* Defendant NNSA is responsible for maintaining the safety, reliability and performance of the nuclear weapons stockpile. 50 U.S.C. § 2401. Additionally, as an agency within the DOE, NNSA's mission is to carry out and ensure all operations and activities are safe and secure. *Id.*

Section 2566, part of the Atomic Energy Defense Provisions, is entitled, "Disposition of Weapons-Usable Plutonium at Savannah River Site." 50 U.S.C. § 2566. Section 2566 details a federal mandate for the construction and operation of the MOX Facility, including the requirement that the Secretary of Energy must submit a plan for the construction and operation of the MOX Facility by February 1, 2003. 50 U.S.C. § 2566(a).

Section 2566(a)(3) stipulates that the Secretary of Energy must submit a report assessing "progress toward meeting the obligations of the United States under the Plutonium Management and Disposition Agreement" to Congress by February 15, 2004 and each year thereafter "whether the MOX production objective has been met."

Section 2566(h) defines the production objective of the MOX Facility as:

[P]roduction at the MOX facility of mixed-oxide fuel from defense plutonium materials at an average rate equivalent to not less than one metric ton of mixed-oxide fuel per year. The average rate shall be determined by measuring production at the MOX facility from the date the facility is declared operational to the Nuclear Regulatory Commission through the date of assessment.

50 U.S.C. § 2566(h)(2).

In the event that the MOX production objective is not met as of January 1, 2014, § 2566(c) requires that Defendants remove from the state "not less than [one] metric ton of defense plutonium or defense plutonium materials" by January 1, 2016, and, "not later than January 1, 2022, remove an amount of defense plutonium or defense plutonium materials equal to the amount transferred to SRS between April 15, 2002, and January 1, 2022, that was not processed by the MOX facility." 50 U.S.C. § 2566(c). The statute requires that the removal of the defense plutonium must be consistent with the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* and other applicable laws. *Id.*

Further, the statute allows for financial and economic assistance payments to the State:

If the MOX production objective is not achieved as of January 1, 2016, the Secretary shall, subject to the availability of appropriations, pay to the State of South Carolina each year beginning on or after that date through 2021 for economic and impact assistance an amount equal to $1,000,000 per day, not to exceed $100,000,000 per year, until the later of—

---

1. Section 2566(h)(2) defines the term "MOX Facility" as the mixed-oxide fuel fabrication facility at the Savannah River Site in Aiken, South Carolina.

(A) the date on which the MOX production objective is achieved in such year; or

(B) the date on which the Secretary has removed from the State of South Carolina in such year at least [one] metric ton of defense plutonium or defense plutonium materials.

50 U.S.C. § 2566(d)(1).

The State filed its Complaint on February 9, 2016, alleging that Defendants failed to comply with 50 U.S.C. § 2566(a), which requires construction of the MOX Facility at the SRS in Aiken County, South Carolina.[2] (ECF No. 1.) The State claims that the violation of § 2566 entitles it to relief in federal district court. (*Id.* at 26.) Specifically, the State seeks (1) a declaration that Defendants' actions and inactions violate the Constitution and an order requiring Defendants to comply with § 2566 (*id.* at 31 ¶ A),[3] (2) a declaration enjoining Defendants to remove immediately one metric ton of defense plutonium or defense plutonium materials pursuant to obligations in § 2566(c) and an order to prevent additional toxic material from entering the MOX Facility (*id.* at 31 ¶ B), and (3) a declaration and order requiring Defendants to pay the State economic and impact assistance payments in the amount of $1,000,000 per day until the earlier of the first 100 days of the calendar year 2016 or Defendants' removal of one metric ton of defense plutonium or defense plutonium materials from the State of South Carolina (*id.* at 32 ¶ C).

On April 25, 2016, Defendants filed a Motion to Dismiss arguing that the State (1) fails to state a claim pursuant to Rule 12(b)(6); (2) has no cause of action under the Administrative Procedure Act ("APA") to compel immediate removal of one ton of defense plutonium; (3) has not alleged an injury sufficient for standing to seek an injunction against future transfers of defense plutonium; (4) lacks standing to seek relief concerning potential agency action in future years; (5) the district court lacks jurisdiction over the State's claim for money relief. (ECF No. 17.) Defendants also asserted sovereign immunity with respect to the State's claims arising from the economic and impact assistance provisions of § 2566(d). (*Id.* at 23–27.) On May 12, 2016, the State filed a response, arguing that only the district court has jurisdiction and authority to declare that Defendants have failed to comply with § 2566(d) and to compel Defendants' compliance. (ECF No. 27.) On May 23, 2016, Defendants filed a reply, arguing that the State has an adequate remedy in the Court of Federal Claims ("CFC") and that 28 U.S.C. § 1491 (the "Tucker Act") impliedly forbids awarding monetary relief in the district court. (ECF No. 33.)

## II. LEGAL STANDARDS AND APPLICABLE LAW

A motion to dismiss for lack of subject matter jurisdiction raises the fundamental question of whether a court has jurisdiction to adjudicate the matter before it. Fed. R. Civ. P. 12(b)(1). "Federal courts are courts of limited subject matter jurisdiction, and as such there is no presumption that the court has jurisdiction." *Pinkley, Inc. v. City of Frederick*, 191 F.3d 394, 399 (4th Cir. 1999). "In determining whether jurisdiction exists, the district court is

---

**2.** The State included a substantial amount of background materials regarding the relationship between Plaintiff and Defendants. However, because of the nature of the State's claim, the additional documents are not necessary in deciding the question of jurisdiction.

**3.** Both parties agreed at the motions hearing that the court does not need to consider the constitutional claims. (ECF No. 51 at 47, 57.)

to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). "The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.* In a motion to dismiss pursuant to Rule 12(b)(1), "[t]he burden of establishing subject matter jurisdiction rests with the plaintiff." *Demetres v. E.W. Constr., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015).

Assertions of governmental immunity are properly addressed under Rule 12(b)(1). *Smith v. Wash. Metro. Area Transit Auth.*, 290 F.3d 201, 205 (4th Cir. 2002). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). Further, suits, such as this one, against a federal officer in his official capacity "is in fact against the sovereign if the [relief sought] would operate against the latter." *Hawaii v. Gordon*, 373 U.S. 57, 57, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963) (per curiam); *see id.* (explaining that official-capacity suit is against the sovereign if, for example, "the [releif] requested would require the [officer]'s official affirmative action, affect the public administration of government agencies and cause ... the disposition of property admittedly belonging to the United States.") "Sovereign immunity deprives a court of jurisdiction to hear a case." *Global Mail Ltd. v. U.S. Postal Serv.*, 142 F.3d 208, 210 (4th Cir. 1998). "All waivers of sovereign immunity must be 'strictly construed in favor of the sovereign.'" *Welch v. United States*, 409 F.3d 646, 650 (4th Cir. 2005) (ellipsis omitted) (quoting *Lane v. Pena*, 518 U.S. 187, 192, 116 S.Ct. 2092, 135

L.Ed.2d 486 (1996)). "For that reason, it is the plaintiff's burden to show that an unequivocal waiver of sovereign immunity exists and that none of the statute's waiver exceptions apply to [its] particular claim. If the plaintiff fails to meet this burden, then the claim must be dismissed." *Id.* at 651 (internal citation omitted) (citing *Medina v. United States*, 259 F.3d 220, 223 (4th Cir. 2001); *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995)).

In its Complaint, the State asserted that this court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, 2201, 2202 and three provisions of the APA, 5 U.S.C. § 702, 704, and 706. (ECF No. 1 at 3–4.) "Section 1331 'is not a general waiver of sovereign immunity. It merely establishes a subject matter that is within the competence of federal courts to entertain.'" *Randall v. United States*, 95 F.3d 339, 345 (4th Cir. 1996). Section 1361, which grants district courts original jurisdiction in mandamus actions against federal agencies, officers, and employees, does not waive sovereign immunity. *See Swan v. Clinton*, 100 F.3d 973, 981 (D.C. Cir. 1996) (citing *Wash. Legal Found. v. U.S. Sentencing Comm'n*, 89 F.3d 897, 901 (D.C. Cir. 1996)). Sections 2201 and 2202, which create declaratory judgment and other relief based on declaratory judgment as remedies available in actions otherwise within a district court's jurisdiction, do not constitute independent bases for jurisdiction and do not waive sovereign immunity. *See CGM, LLC v. BellSouth Telecomm., Inc.*, 664 F.3d 46, 55–56 (4th Cir. 2011); *see also Gabriel v. Gen. Servs. Admin.*, 547 Fed. Appx. 829, 831 (9th Cir. 2013). Moreover, the State points to no waiver of sovereign immunity expressly made applicable to 50 U.S.C. § 2566, the statutes on which it bases its claims, and there does not appear to be any. Accordingly, the State's only recourse is to prove that the general waiv-

ers of sovereign immunity in the APA or the Tucker Act apply. *See Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 480 F.3d 1116, 1121–22 (Fed. Cir. 2007) ("If the suit is a civil action, other than in tort, there are two general statutes that waive sovereign immunity. One is the Tucker Act.... [and t]he other ... is the Administrative Procedure Act...."). In its response to the motion to dismiss, the State relies only on the APA for its assertion that sovereign immunity has been waived. (*See* ECF No. 27 at 22 n. 15, 24.)

■ A waiver of sovereign immunity authorizing jurisdiction in a district court is available when a party satisfies the requirements of both § 702 and § 704 of the APA. *Bowen v. Massachusetts*, 487 U.S. 879, 891–93, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988); *see Consol. Edison of N.Y. v. U.S. Dep't of Energy*, 247 F.3d 1378, 1382 (Fed. Cir. 2001) ("The Supreme Court has explained that a litigant may invoke the APA as a waiver of sovereign immunity, thereby invoking district court jurisdiction, if the litigant can satisfy both ... § 702 and ... § 704." (parentheticals omitted)). The APA entitles a party "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute" to judicial review of the agency action. 5 U.S.C. § 702. Section 702 of the APA specifies that sovereign immunity is not available as a defense when the party seeks "relief other than money damages" against the United States or its agencies. 5 U.S.C. § 702. Section 704 of the APA specifies that judicial review of agency action may be had when "there is no other adequate remedy in a court." 5 U.S.C. § 704. Thus, courts interpreting §§ 702 and 704, have held that in order for the APA's waiver of sovereign immunity to apply, a claim must (1) request "relief other than money damages" and (2) show no "adequate remedy" is available elsewhere,

such as in the Court of Federal Claims ("CFC") under the Tucker Act. *See Doe v. United States*, 372 F.3d 1308, 1312 (Fed. Cir. 2004).

■ The Tucker Act is a jurisdictional statute that waives sovereign immunity protection and authorizes monetary claims "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated damages in cases not sounding in tort." 28 U.S.C. §§ 1346, 1491(a)(1); *See United States v. Testan*, 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) ("[T]he Tucker Act is merely jurisdictional, and a grant of a right of action must be made with specificity."). A district court retains concurrent jurisdiction with the CFC over Tucker Act claims for $10,000 or less under § 1346(a)(2) ("Little Tucker Act"). For claims greater than $10,000, § 1491(a)(1) ("Tucker Act") assigns exclusive jurisdiction to the CFC. *See Jan's Helicopter Serv. v. F.A.A.*, 525 F.3d 1299, 1304 (Fed. Cir. 2008); *Tootle v. Sec. of the Navy*, 446 F.3d 167 (D.C. Cir. 2006) ("Under the Tucker Act, the [CFC] is vested with exclusive jurisdiction over cases involving non-tort money damages in excess of $10,000.") A claim must be for more than $10,000, and the statute must be "money-mandating" for the CFC to retain jurisdiction. *See Doe*, 372 F.3d at 1312; *Testan*, 424 U.S. at 400, 96 S.Ct. 948.

## III. ANALYSIS

The State primarily seeks to enforce what it avers are two statutory rights. First, the State prays for a declaration and an injunction requiring Defendants to make the § 2566(d)(1) economic and impact assistance payments in the amount of $1,000,000 per day until the $100,000,000 per year cap is met or one metric ton of plutonium is removed (the "monetary

claim") (ECF No. 1 at 32.) The court concludes that the APA does not waive sovereign immunity for the monetary claim, as there is an adequate remedy available in the CFC under the Tucker Act, and that this court lacks jurisdiction to entertain the claim.

Second, the State prays for a declaration and an injunction, requiring Defendants to remove one metric ton of plutonium from SRS pursuant to § 2566(c) (the "removal claim"). (*Id.* at 31.) In addition, the State prays for a number of related equitable remedies (*see* ECF No. 1 at 31–32 (requesting an injunction requiring Defendants to comply with § 2566, an injunction prohibiting Defendants from placing additional plutonium at SRS, an order retaining jurisdiction over the case in order to ensure compliance with other relief granted, and an order requiring Defendants to file an annual status report regarding Defendants' progress in meeting the relief ordered by the court).) It is obvious from the face of the Complaint, and the State made clear at the motions hearing, that these other prayers for relief were intended to allow the court to fashion an alternative equitable remedy in the event the court determined that ordering the immediate removal of the plutonium would likely violate other applicable laws, would be impossible, or otherwise would be inequitable. (*See* ECF No. 51 at 13–14, 21–24.) Thus, the court treats these prayers for relief as subsidiary to the removal claim. Because the court concludes that it has jurisdiction over the removal claim and that the monetary claim and removal claim must be bifurcated, the court declines to consider Defendants' Rule 12(b)(6) challenge to the removal claim until it receives further briefing from the parties.

4. "The interplay between the Tucker Act and the APA is somewhat complicated and raises some significant issues of federal court jurisdiction." *Randall,* 95 F.3d at 346. Thus, the

**A. The court lacks subject matter jurisdiction over the monetary claim because the APA does not waive sovereign immunity with respect to the monetary claim.**

▮▮▮ As a preliminary matter, "[t]o resolve the sovereign immunity and jurisdiction questions, [the court] must consider [the State]'s claims individually." *Transohio Sav. Bank v. Dir., Office of Thrift Supervision,* 967 F.2d 598, 609 (D.C. Cir. 1992) (citing *Sharp v. Weinberger,* 798 F.2d 1521, (D.C. Cir. 1986) (Scalia, J.)). Defendants raised sovereign immunity only with respect to the monetary claim. (*See* ECF No. 17 at 30–34; ECF No. 51 at 31–33, 46.) Nonetheless, in an abundance of caution, the court assesses whether sovereign immunity prohibits consideration of both the monetary claim and the removal claim. *See Randall,* 95 F.3d at 344–45 (raising jurisdictional issue for the first time *sua sponte* and noting that "[t]he [Fourth Circuit]'s concern about jurisdiction ... stems primarily from the district court's failure to address the issue of sovereign immunity.")

▮▮▮ The court's analysis begins by determining, under § 704 of the APA, if another court can provide an adequate remedy. *See id.* at 346 ("[T]o determine whether [a p]laintiff's suit is cognizable under the APA, the court must *first* examine whether [it] has an available remedy under the Tucker Act." (emphasis added)); *Suburban,* 480 F.3d at 1124–26 (offering multiple reasons why "it is preferable to start with the § 704 'adequate remedy' limitation rather than the 'money damages' limitation found in § 702"). If a suit at its base is a claim for money, and the relief available in the CFC provides an adequate remedy, then the analysis is at an end.[4] *See Suburban,* 480 F.3d at

. court pays special heed to decisions from the Federal Circuit and the CFC, which have extensive experience with these issues. *See id.*

1125 (citing *Christopher Vill., L.P. v. United States*, 360 F.3d 1319 (Fed. Cir. 2004) (finding an adequate remedy in the CFC without analyzing money damages limitation)); *Consol. Edison*, 247 F.3d at 1382–83 (declining to address the money damages issue because the CFC would provide an adequate remedy); *Kanemoto v. Reno*, 41 F.3d 641, 644 (Fed. Cir. 1994) (treating the adequate remedy issue as a threshold question).

■■■ "Section 704 codifies a requirement ensuring that the general grant of review in the APA does not 'duplicate existing procedures for review of agency action.'" *Bowen*, 487 U.S. at 903, 108 S.Ct. 2722. Essentially, § 704 withdraws the waiver of immunity in § 702 if an adequate judicial remedy is available elsewhere. *Consol. Edison*, 247 F.3d at 1383; *see also Kanemoto*, 41 F.3d at 644. The Federal Circuit has held that if a plaintiff's claim falls within the jurisdiction of the CFC and that court can provide an adequate remedy, then the proper forum for resolution of the dispute is not a district court under the APA, but the CFC under the Tucker Act. *Suburban*, 480 F.3d at 1126.

Any assessment of the interplay between the APA's and the Tucker Act's waivers of sovereign immunity must begin with the Supreme Court's opinion in *Bowen*. In *Bowen*, the commonwealth of Massachusetts brought an action against a federal agency seeking declaratory and injunctive relief to compel the reimbursement of money related to Medicaid expenditures. *Bowen*, 487 U.S. at 886–87, 108 S.Ct. 2722. The Medicaid program required the agency to make advance payments for future costs the commonwealth incurred by managing the program. *Id.* at 883–85, 108 S.Ct. 2722. The Supreme Court determined that the CFC [5] did not have exclusive jurisdiction. *Id.* at 905, 108 S.Ct. 2722. The Court reasoned that the CFC had no power to grant equitable relief, and the Court was "not willing to assume that a naked money judgment against the United States will always be an adequate substitute for prospective relief fashioned in the light of the rather complex ongoing relationship between the parties." *Id.*

■■■ As the Federal Circuit observed in *Consolidated Edison*, "*Bowen* ... does not enunciate a broad rule that the CFC cannot supply an adequate remedy in any case seeking injunctive relief." *Consol. Edison*, 247 F.3d at 1383. Indeed, in the wake of the "confusion regarding the jurisdiction of the courts" generated by *Bowen*, the Federal Circuit has "cautioned litigants that dressing up a claim for money as one for equitable relief will not remove the claim from Tucker Act jurisdiction and make it an APA case." *Suburban*, 480 F.3d at 1123–24; *see also Consol. Edison*, 247 F.3d at 1385 ("This court and its sister circuits will not tolerate a litigant's attempt to artfully recast its complaint to circumvent the jurisdiction of the Court of Federal Claims."); *Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 199 (Fed. Cir. 1997) ("[Courts] look to the true nature of the action in determining the existence or not of jurisdiction." (internal quo-

---

The CFC has observed that "[t]he jurisdictional holding in *Bowen* is complex. Indeed, the subsequent decisions of the Federal Circuit interpreting the jurisdictional holding of *Bowen* ... offer a kaleidoscopic view of *Bowen* as it applies to various jurisdictional controversies. However, it is possible to discern one primary factor.... The pivotal question is whether this court can provide [the plaintiff] with an adequate remedy." *District of Columbia. v. United States*, 67 Fed.Cl. 292, 315 (2005).

**5.** *Bowen* actually concerned the CFC's predecessor, the United States Claims Court, which itself was the successor of the Court of Claims.

tation marks omitted)). In determining whether a claim is for equitable relief or is instead for money, the primary inquiry under § 704 is whether the complaint seeks essentially a monetary reward:

> when the plaintiff's claims, regardless of the form in which the complaint is drafted, are understood to be seeking a monetary reward from the Government, then . . . a straightforward analysis calls for determining whether the case falls within the jurisdiction of the Court of Federal Claims. If that court can provide an adequate remedy—if a money judgment will give the plaintiff essentially the remedy he seeks—then the proper forum for resolution of the dispute is not a district court under the APA but the Court of Federal Claims under the Tucker Act.

*Suburban*, 480 F.3d at 1126. In determining whether the CFC can provide an adequate remedy, the Federal Circuit has also explained that a court should consider the complexity and constancy of the relationship at issue between the plaintiff and the federal government. *See id.* at 1127; *Consol. Edison*, 247 F.3d at 1383 ("[T]he Court of Federal Claims may well supply an adequate remedy in cases without a complex ongoing federal-state interface.").

### 1. Nature of the relief sought

Here, although the State dresses its monetary claim in the garb of an equitable remedy—seeking a declaration and an injunction requiring Defendants to pay the § 2566(d) amounts—the court concludes that the claim is essentially one for monetary relief. The monetary claim is a request for a monetary reward from the federal government because it is based on an allegation of liability for Defendants' failure to make the payments in accordance with § 2566(d). By couching the claim in equitable terms, the State does not remove the claim from Tucker Act jurisdiction and thereby meet the § 704 requirement. *See Suburban*, 480 F.3d at 1123–24, 1126. Indeed, the State's request for enforcement of a statutorily prescribed payment of money from the federal coffers fits squarely within the jurisdiction conferred on the CFC. *See Kanemoto*, 41 F.3d at 647 ("The Court of Federal Claims has the power to make a determination of liability that will give rise to a remedy of monetary relief by finding . . . that an agency has misinterpreted its statutory mandate to pay out monies. . . ."); *District of Columbia*, 67 Fed.Cl. at 313 ("[A] money judgment in the Court of Federal Claims offers complete relief to a party seeking equitable relief such as a declaratory judgment and an injunction of required payments.").

The fact that § 2566(d) conditions payment on certain contingent events is of no moment. The Federal Circuit, in assessing the scope of the CFC's Tucker Act jurisdiction, has "emphasized" that statutes will satisfy the "money-mandating" requirement so long as "Congress intended an award to be made when a claimant met the statutory conditions." *Doe v. United States*, 100 F.3d 1576, 1580 (Fed. Cir. 1996). The CFC reached the same conclusion after canvassing the Federal Circuit's post-*Bowen* cases. *See District of Columbia*, 67 Fed.Cl. at 305. The State's argument that § 2655(d) is not implicated by § 704 because the statute mandates a fine or penalty rather than damages or compensation for past injuries is likewise without merit. Even accepting *arguendo* the State's characterization of the provision, the Federal Circuit and the CFC have held that such provisions are encompassed by § 704. *See Kanemoto*, 41 F.3d at 646 ("[T]he Tucker Act is not limited to suits for money damages. Indeed, *Bowen* reaffirmed the Court of Federal Claims' jurisdiction over causes of action for payment of money other than damages, including statutory causes of action. . . ."); *ARRA*

*Energy Co. I v. United States*, 97 Fed.Cl. 12, 25 (2011) (rejecting assertion that CFC "has jurisdiction only over those claims that are based on a statute containing an express damages remedy for its violation by the government").

The State also contends that the CFC cannot provide an adequate remedy because some of the monetary relief it seeks is prospective. The State seeks an order to pay the $1,000,000 per day per first-hundred-day per year amounts not only for the year 2016, in which, it claims, the payments have already become due, but also an order requiring Defendants to make those payments as they become due under the statute in the future. Because it requests an order for Defendants to make future payments that are not yet due, the State argues the CFC cannot provide an adequate remedy. This argument fails too. The Federal Circuit has determined that "a money judgment against a federal defendant can impact on its future behavior through doctrines such as collateral estoppel." *Suburban*, 480 F.3d at 1127; *See also* § 1491(a)(2)) (authorizing the CFC "[t]o provide an entire remedy and to complete the relief afforded by judgment" of equitable relief attached to a money judgment); *Consol. Edison*, 247 F.3d at 1385 ("[r]elief from [plaintiff's] retrospective obligations will also relieve it from the same obligations prospectively").Thus, as the Federal Circuit has explained with regard to comparable statutes, a naked money judgment would provide the State an adequate remedy because the CFC could, in effect, "declare" the proper interpretation of the statute, and a judgment would "compel" the defendants to make redress sought by the plaintiffs. *Kanemoto*, 41 F.3d at 646.

### 2. Nature of the relationship

Federal Circuit precedent encourages courts assessing a claim under § 704 to consider the complexity and constancy of the relationship at issue between the plain-tiff and the federal government. *See Suburban*, 480 F.3d at 1127; *Consol. Edison*, 247 F.3d at 1383. The Federal Circuit has observed that the complex circumstances in *Bowen* are not present in most cases. *Suburban*, 480 F.3d at *Id.* (citing *Consol. Edison*, 247 F.3d at 1383). In *Suburban*, The court, deciding the plaintiff's § 704 jurisdiction argument, acknowledged that the adequacy of the remedy depends on the complexity of the circumstances. *Id.* After its review, the court found that the facts in that case were unlike Bowen because:

> [T]he dispute [in *Bowen*] centered on the administration of a major federal grant, the Medicaid program, involving enormous sums of money and complex interactions between the governments and the beneficiaries ... and the money involved in the uncovered education services was a small fraction of the total reimbursement the state received each year for its Medicaid costs under the program.

*Id.* Similarly, the Federal Circuit in *Consolidated Edison* found the statutory provisions in that case also were unlike those in *Bowen* because they did not involve managing "'relationships between States and the Federal Government that occur over time and that involve constantly shifting balance sheets.' In sum, th[e] case does not 'involve state governmental activities that a district court would be in a better position to understand and evaluate' than the [CFC]." *Consol. Edison*, 247 F.3d at 1384 (quoting *Bowen*, 487 U.S. at 904, 108 S.Ct. 2722).

The prime example of a statute, on one pole, that creates such an ongoing, complex relationship between the plaintiff and the federal government for which a naked money judgment from the CFC will not provide an adequate remedy is found in *Bowen*, which the court has described

above. The archetype for a statute on the opposite pole, a statute creating a relationship that is neither complex nor continuous, is found in *Kanemoto*, in which Congress provided for a one-time restitution payment to resident aliens who were interned in the United States during the Second World War. *See Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 201–02 (Fed. Cir. 1997) (assessing whether statute was "more akin to *Bowen*. . . [or] *Kanemoto*"). Section 2566(d)'s monetary payment provision falls somewhere on the spectrum between the poles of *Bowen* and *Kanemoto*. Unlike *Kanemoto*, this case involves the relationship between a state government and the federal government, which normally entails a relationship more complex and continuous than arises when a private plaintiff seeks a one-time payment. *See Suburban*, 480 F.3d at 1127 ("*Bowen* was a dispute between two sovereigns—a state government and the federal government—implicating federalism issues"). Furthermore, the relief the State seeks is not a one-time payment, but instead an order that would, though to a slight degree, affect the federal government's future behavior beyond payments that would already be due by the time litigation ended. *See id.* (noting that *Bowen* involved a claim for relief that would "modify the Government's *future* obligations under the program").

Although § 2566(d) and the relief the State seeks thereunder do not fall squarely in line with *Kanemoto*, the court concludes that the relationship between the State and the Defendants is not so akin to the relationship involved in *Bowen* that the CFC could not provide an adequate remedy. Unlike in *Bowen*, the dispute here does not center on the *administration* of a major grant to the State, and it does not involve interactions between the two government and third-party beneficiaries. *See id.* Although the State's monetary claim seeks to enforce payment of the statutorily prescribed amounts if those amounts become due in the future, the future obligations imposed on Defendants would be relatively simple and, as the court previously determined, would not " 'make it appropriate for judicial review to culminate in the entry of declaratory or injunctive relief that requires the [federal] government to modify future practices' with respect to the disposition of appropriated funds." *Nat'l Ctr.*, 114 F.3d at 202 (quoting *Bowen*, 487 U.S. at 893, 108 S.Ct. 2722). In sum, the § 2566(d) monetary provision and the State's claim arising under it envision straightforward and easily calculable payments to the State. Even if the State's claim is for payments of future obligations, neither the claim nor the statute implicate the type of complex, ongoing relationship at issue in *Bowen* that would test the CFC's competence to provide adequate relief.

Having reviewed both the nature of the relief sought in the State's monetary claim and the relationship between the State and the federal agencies at issue, the court determines that the CFC could provide an adequate remedy as that term is understood in § 704 of the APA. Accordingly, the court concludes the APA does not waive Defendants' sovereign immunity with respect to the monetary claim.

**B. The court has subject matter jurisdiction over the removal claim because the APA waives sovereign immunity with respect to the removal claim and because the State has met the standing requirements.**

1. The APA waives sovereign immunity with respect to the removal claim.

██ Unlike the monetary claim, the court concludes that the CFC would not be able to provide an adequate remedy for the State's removal claim. The State requests a declaration and an injunction re-

quiring Defendants to remove plutonium from SRS in the amounts required by § 2566(c) or to fashion some other form of equitable relief that would, eventually, cause Defendants to remove the plutonium. If, after looking beyond the form of the claim, the court determined that this requested relief were in substance merely another attempt to obtain monetary relief under § 2566(d), then the court would not hesitate to conclude that the CFC could provide an adequate remedy and that the APA's waiver of sovereign immunity does not apply. However, the court determines that the State's removal claim does not merely seek a monetary reward. In reaching this conclusion, the court notes that, if the State were successful on its removal claim, it may still fail on its monetary claim. This is so because § 2566(d) requires an additional condition precedent to payment of the statutory amounts, namely the availability of appropriations. More importantly, if the State were successful on its monetary claim, this would not necessarily result in success on its removal claim. A naked money judgment under § 2566(d) would not necessarily determine whether Defendants are obligated under § 2566(c) to remove the plutonium from SRS; it would merely determine that Defendants are obligated to pay the § 2566(d) amounts if they opt not to remove the plutonium required to be removed by § 2566(d)(1)(B). Because the relief requested in the State's removal claim appears to be purely equitable in nature, the CFC could not provide an adequate remedy.

Moreover, the court concludes that the relationship between the State and Defendants counsels in favor of jurisdiction under the APA. Not only is Plaintiff here a state, entailing federalism concerns, but the relief it seeks would modify the federal government's conduct in a way that would require entry of declaratory or injunctive relief. Further, unlike the monetary claim, the removal claim more clearly touches on the administrative aspects of federal nuclear and environmental programs (not to mention international treaties) and implicates more complex interactions than straightforward, easily-calculable payments. *See Suburban*, 480 F.3d at 1127. Accordingly, the court concludes that, under § 704, the CFC does not provide an adequate remedy for the removal claim.

The court also concludes that, in its removal claim, the State seeks relief other than money damages for purposes of § 702. This follows from the court's determination that the removal claim is for purely equitable relief. On its face, the request that the court compel Defendants to remove the plutonium is not a request for money damages. Because there is no adequate remedy for the removal claim in another court and because the claim is for other than money damages, the APA waiver of sovereign immunity applies to the claim, and the court has jurisdiction over it. *See Bowen*, 487 U.S. at 891–93, 108 S.Ct. 2722; *Consol. Edison*, 247 F.3d at 1382.

## 2. The State has standing to bring the removal claim and subsidiary prayers for relief.

 Aside from asserting sovereign immunity with respect to the monetary claim, Defendants make two other jurisdictional arguments, both of which claim that the State lacks standing to bring certain claims. Summarizing constitutional standing analysis, the Supreme Court in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), explained that "the irreducible constitutional minimum of standing contains three elements." 504 U.S. at 560, 112 S.Ct. 2130.

First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or im-

minent, not conjectural or hypothetical[.] Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 560–61, 112 S.Ct. 2130 (internal citations, quotation marks, footnote, brackets, and ellipses omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561, 112 S.Ct. 2130. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice. . . ." *Id.* The failure to meet this burden constitutes a jurisdictional defect. *See United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.,* 741 F.3d 390, 402 (4th Cir. 2013).

Defendants' first argument concerns the State's request for an injunction barring Defendants from bringing any more plutonium into SRS until the MOX Facility objectives are achieved. (*See* ECF No. 1 at 34–35.) Defendants argue that the State lacks standing to seek this relief because, if the MOX Facility objectives are not achieved, § 2566(b)(5) requires Defendants to suspend transfers to SRS of only plutonium that is to be processed at the MOX Facility and because the State has not shown that Defendants' transfer of plutonium to be processed at the MOX Facility is imminent.[6] In so arguing, Defendants appear to assert that the State cannot meet the injury-in-fact prong of constitutional standing because it has not demonstrated

that a violation of § 2566(b)(5) has occurred or is imminent. (*See id.*)

■■■ Defendants misconstrue the Complaint. The State does not seek to enforce the § 2566(b)(5) requirement that plutonium designated for MOX Facility processing not be transferred to SRS unless and until the MOX Facility objectives are met; rather, the State very clearly seeks to enforce the § 2566(c) provision that certain amounts of plutonium be removed from SRS if the objectives are unmet and the § 2566(d) provision that payments be made to the State if the objectives remain unmet and the plutonium is not removed. As previously explained, the State sought several forms of relief in relation to the removal claim, recognizing that an injunction requiring Defendants to immediately remove the plutonium might not be available under a balance of the equities involved in this case. (*See* ECF No. 51 at 13–14, 21–24.) Much of the relief sought—including an injunction prohibiting further transfers of plutonium to SRS and an injunction requiring Defendants file annual status reports with the court—appear to be intended as remedies in lieu of a straightforward injunction mandating the immediate removal of plutonium. Thus, the injury that the State seeks to redress by such relief is not an alleged violation of § 2566(b)(5)[7] but an alleged violation of § 2566(c), which requires Defendants to remove a certain amount of plutonium from SRS. Whether the relief requested would redress such an injury is discussed below, but the court has no trouble in concluding that the injury itself—Defendants' failure to remove the plutonium—has been sufficiently alleged for the purposes of standing at the pleading stage.

---

6. Defendants note that DOE suspended transfers to SRS of plutonium designated for MOX Facility processing until the MOX Facility objectives are met. (*See* ECF No. 17 at 34; ECF No. 10–40.)

7. The Complaint contains no allegation that Defendants have violated or will violate § 2566(b)(5).

Defendants' second argument is that the relief requested in lieu of an injunction mandating immediate removal of plutonium from SRS fails to meet the redressability prong of the standing requirement. (ECF No. 17 at 36–38.) Specifically, Defendants claim that the State's request for an injunction requiring Defendants to file annual status reports would not redress any injury alleged by the State and that it only relates to future circumstances that are uncertain. (*Id.*) Defendants thus assert that the district court lacks jurisdiction to craft and enforce the injunctions requested.

This court does not believe that the redressability analysis is as circumscribed as Defendants suggest. The court notes that Defendants do not cite any authority directly on point, and the court's own research has not unearthed any. The most relevant line of cases concerning redressability are those following *Massachusetts v. EPA*, 549 U.S. 497, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007). In that case, the commonwealth of Massachusetts challenged the EPA's refusal to regulate greenhouse gas emissions, alleging that inaction contributed to environmental damage within the commonwealth, such as rising sea levels at its shores, and seeking reversal of the EPA's decision not to regulate. 549 U.S. at 510–13, 127 S.Ct. 1438. The Court concluded that Massachusetts met the redressability element. *Id.* at 525–26, 127 S.Ct. 1438. In so doing, the Court explained that "[w]hile it may be true that regulating motor-vehicle emissions will not by itself *reverse* global warming, it by no means follows that we lack jurisdiction to decide whether EPA has a duty to take steps to *slow* or *reduce* it." *Id.* at 525, 127 S.Ct. 1438 (citing *Larson v. Valente*, 456 U.S. 228, 244 n.15, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982)). The Court also deemed the fact that other countries might increase their emissions was of little rele-

vance to the redressability analysis because, "[a] reduction of domestic emissions would slow the pace of global emissions increases, no matter what happens elsewhere." *Id.* at 526, 127 S.Ct. 1438. In short, the fact that the risk of injury alleged "would be reduced to some extent if petitioners received the relief they seek" was enough to satisfy the redressability element. *Id.*

Interpreting *Massachusetts v. EPA*, a number of courts have reached conclusions favoring a more expansive view of redressability than the one advanced by Defendants. *See Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 905 (10th Cir. 2012) ("[S]tanding is proper where a favorable decision would relieve 'some extent' of an injury."); *Amnesty Int'l USA v. Clapper*, 667 F.3d 163, 170 (2d Cir. 2011) ("Where a challenged action increases an already extant risk of harm to a plaintiff, the elimination of that action would redress the harm it causes—even if it does not eliminate the preexisting risk."); *Lozano v. City of Hazleton*, 620 F.3d 170, 192 (3d Cir. 2010) ("Redressability ... does not require that a court be able to solve all of a plaintiff's woes. Rather, [it] need only be able to redress, to some extent, the specific injury underlying the suit."), *vacated and remanded for further consideration*, 563 U.S. 1030, 131 S.Ct. 2958, 180 L.Ed.2d 243 (2011), *affirmed in part and reversed in part on other grounds*, *Lozano v. City of Hazleton*, 724 F.3d 297 (3d Cir. 2013); *Connecticut v. Am. Elec. Power Co., Inc.*, 582 F.3d 309, 349 (2d Cir. 2009) (agreeing with the plaintiffs that "[e]ven if emissions increase elsewhere, the magnitude of [the p]laintiffs' injuries will be less if [the d]efendants' emissions are reduced than they would be without a remedy"), *rev'd on other grounds*, 564 U.S. 410, 131 S.Ct. 2527, 180 L.Ed.2d 435 (2011); *Ohio Valley Envtl. Coal., Inc. v. Hobet Mining, LLC*, 702 F.Supp.2d 644, 653 (S.D.W. Va. 2010) ("[N]otwithstanding the continued likeli-

hood of ... pollution ..., obtaining injunctive relief would likely increase [the p]laintiffs' aesthetic and recreational enjoyment of the geographic area in question, satisfying redressability."). Although these cases do not directly address the issue faced here, they are at least consistent with the proposition that a plaintiff's requested equitable relief need not completely eliminate the harm complained of; rather, the requested relief need only, to some extent, decrease the likelihood or magnitude of the harm.

Here, the court concludes that the alternative relief requested by the State—such as an injunction prohibiting additional plutonium transfers to SRS and an injunction requiring annual reports meet the redressability requirement. The injury of which the State complains is not merely the violation of a federal statute; it is the interest that the statute is designed to protect. The provisions of § 2566 evince a design to insure that, within the deadlines set by Congress, unprocessed plutonium designated for MOX Facility processing either would be processed in specified amounts or else would be reduced through other methods. The alleged injury in Defendants disregarding this scheme is the accumulation of unprocessed plutonium at SRS for an indefinite period or, as the State put it on numerous occasions, the risk that the lands owned by the State comprising SRS will become a permanent dumping ground for unprocessed plutonium, despite the provisions of § 2566. The relief the State seeks—an order prohibiting further shipments of plutonium to SRS and an order requiring Defendants to report on whether it has taken measures consistent with the statutory scheme and, if not, whether it had justifications for not doing so—although it will not completely eliminate the harm at issue, would serve to mitigate the

magnitude of the harm (by, at least, preventing the increase of unprocessed plutonium) and the risk of the harm (by ensuring the parties and the court know the extent to which Defendants are following the statutory scheme designed to prevent the accumulation of unprocessed plutonium at SRS). Therefore, the court concludes that the State has met the redressability element of the jurisdictional standing requirement. Having perceived no other jurisdictional bar and being apprised of no other by Defendants, the court concludes that it has jurisdiction over the State's removal claim.

## C. Further briefing is needed before the court proceeds to consider Defendants' Rule 12(b)(6) challenge to the State's removal claim.

Having concluded that the court has jurisdiction over the removal claim, that it lacks jurisdiction over the monetary claim, and that the CFC would provide an adequate remedy for the monetary claim, the court believes it is in the interests of justice and judicial efficiency to receive further briefing on the next step in this litigation. The court's caution is necessitated by the potential procedural pitfalls attending parallel litigation in this court and the CFC.

### 1. Transferring the monetary claim to the CFC might not be in the interests of justice.

The court has determined that the CFC alone might exercise jurisdiction over the State's monetary claim and that the district court has jurisdiction over its removal claim. In such circumstances, the court may bifurcate the claims and transfer the monetary claim to the CFC, pursuant to 28 U.S.C. § 1631.[8] The Federal Circuit has held that § 1631 permits transfers to the

---

**8.** The court notes that it is not clear whether it should follow the law of the Federal Circuit

or of the Fourth Circuit in determining

CFC of "less than all the claims in a civil action," and it considers the transferred claims to be bifurcated from the un-transferred claims remaining in the district court. *United States v. Cnty. of Cook*, 170 F.3d 1084, 1089 (Fed. Cir. 1999); *accord Harbuck v. United States*, 378 F.3d 1324, 1328 (Fed. Cir. 2004). Thus, the court must transfer the monetary claim to the CFC, if it concludes that doing so might not be "in the interest of justice." 28 U.S.C. § 1631.

■■■■ The problem with this procedural option is that it is likely to result in the CFC's finding that it lacks jurisdiction over the monetary claim, pursuant to 28 U.S.C. § 1500. "[Section 1500's] purpose [is] to 'force plaintiffs to choose between pursuing their claims in the [CFC] or in another court' and to prevent the United States from having to litigate and defend against the same claim in both courts." *Harbuck*, 378 F.3d at 1328 (quoting *UNR Indus. v. United States*, 962 F.2d 1013, 1018, 1021 (Fed. Cir. 1992) (en banc)). It does so by depriving the CFC of "jurisdiction over a claim if the plaintiff has another suit for or in respect to that claim pending against the United States or its agents," meaning that the CFC lacks jurisdiction over a claim if another claim is pending in district court and the two claims "are 'based on substantially the same operative facts'" regardless of whether the relief sought by the plaintiff for each claim overlaps. *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 311, 317, 131 S.Ct. 1723, 179 L.Ed.2d 723

(2011) (quoting *Keene Corp. v. United States*, 508 U.S. 200, 212, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993)). Because a claim transferred to the CFC pursuant to § 1631 is treated as if it were filed in the CFC on the date it was filed in the district court and because "'[t]he question of whether another claim is 'pending' for purposes of § 1500 is determined at the time at which the suit in the [CFC] is filed,'" *Harbuck*, 378 F.3d at 1324 (quoting *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1548 (Fed. Cir. 1994) (en banc)), "'the 'filing' of the same claim simultaneously in the district court and the [CFC] by operation of § 1631 deprives the latter court of jurisdiction pursuant to § 1500.'" *Id.* at 1328 (alteration omitted) (quoting *Cnty. of Cook*, 170 F.3d at 1091). Here, a § 1631 transfer of the monetary claim to the CFC would likely result in its dismissal under § 1500, as the court would not transfer the removal claim, a claim that would be understood as pending in the district court at the time the monetary claim was filed and that is based on substantially the same operative facts as the monetary claim.

2. Dismissal without prejudice to refiling in the CFC risks monetary claim being delayed or time-barred.

■■■■ A possible alternative to a § 1631 transfer of the monetary claim to the CFC is for the court, instead, to dismiss the monetary claim without prejudice to the State's ability to refile the claim in an original action in the CFC.[9] *See Thomas v.*

---

whether, in these circumstances, the claims may be bifurcated. *Cf. Afifi v. U.S. Dep't of the Interior*, 924 F.2d 61, 62–64 (4th Cir. 1991) (describing difficulty in determining which appellate court reviews mixed cases). Nonetheless, because there appears to be no precedent from the Fourth Circuit regarding the issue, the court concludes that, even if its law trumped, the Fourth Circuit would look to the law of the Federal Circuit for guidance. *See Randall*, 95 F.3d at 346 (looking to Federal

Circuit law when that court has extensive experience on an issue).

9. Transfer under § 1631 is preferred if the dismiss-and-refile procedure would be futile because the case is time-barred. *See Gunn v. U.S. Dep't of Agric.*, 118 F.3d 1233, 1240 (8th Cir. 1997) ("Section 1631 was enacted so that parties confused about which court has subject-matter jurisdiction would not lose an opportunity to present the merits of a claim by filing in the wrong court and then, upon dis-

*Thomas,* No. SACV 14–1096–JLS (RNBx), 2015 WL 12681311, at *6 (C.D. Cal. May 8, 2015); *Hinton v. Warden,* No. 2:09cv90, 2009 WL 2436578, at *4 (E.D. Va. Aug. 6, 2009). If the court chose this option, the risk of immediate dismissal in the CFC under § 1500 is avoided, and the court could proceed with the removal claim, including consideration of the Rule 12(b)(6) challenge to it. However, by proceeding with the removal claim, other problems might inhere.

If the court considered Defendants' Rule 12(b)(6) challenge to the removal claim and denied it, there is a risk that adjudication of the State's monetary claim in the CFC would be delayed and, eventually, time-barred. As the above discussion of § 1500 illustrates, the State would be unable to raise its monetary claim in the CFC until the removal claim was no longer pending in this court. If the monetary claim were filed in the CFC any earlier, it very likely would be dismissed for lack of jurisdiction under § 1500. If litigation in this court continued for a sufficient time, the statute of limitations might run and the State might be forever barred from pursuing its monetary claim.

### 3. Dismissal without prejudice to refiling in the CFC risks the proceedings being stayed.

If, after this court dismissed the monetary claim without prejudice, the CFC exercised jurisdiction over it, it is possible that this court might stay proceedings on the matter until the monetary claim in the CFC is adjudicated or that the CFC might stay proceedings on the monetary claim until the removal claim is adjudicated. This is so due to the nature of Defendants' Rule

12(b)(6) arguments, which the court explains in the following paragraphs.

In its removal claim, the State asserts that it is entitled to an injunction requiring Defendants to remove one metric ton of plutonium from SRS due to Defendants' failure to remove the plutonium in accordance with § 2566(c)(1). (ECF No. 1 at 27–28.) Section 2566(c)(1) provides that "[i]f the MOX production objective is not achieved as of January 1, 2014, the Secretary shall, consistent with the National Environmental Policy Act of 1969 and other applicable laws, remove from the State of South Carolina, for storage or disposal elsewhere ... not later than January 1, 2016, not less than [one] metric ton of defense plutonium or defense plutonium materials." 50 U.S.C. § 2566(c)(1). The court regards this claim as proceeding under the so-called "agency inaction" provision of the APA, which provides that a "reviewing court shall ... compel agency action unlawfully withheld." 5 U.S.C. § 706(1).

 In *Norton v. Southern Utah Wilderness Alliance (SUWA),* the Supreme Court set out the "limits the APA places upon judicial review of agency inaction." 542 U.S. 55, 61, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004). Relevant here, the Court held that "a claim under [section] 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take.*" *Id.* at 64, 124 S.Ct. 2373 (emphases in original); *see also Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs,* 714 F.3d 186, 195–96 (4th Cir. 2013). The Court noted that the APA's requirement that the withholding be "unlawful" relates

missal, having the claim barred by a statute of limitations. Accordingly, we have in the past directed transfer when a plaintiff in good faith filed in the wrong court and the statute of limitations would have run before he could

refile properly.") Here, the timeliness of the monetary claim does not appear to be an issue. *See* 28 U.S.C. § 2501 (setting six-year statute of limitations for claims before the CFC).

to the traditional mandamus remedy, which "was normally limited to enforcement of a specific, unequivocal command." *SUWA*, 542 U.S. at 63, 124 S.Ct. 2373 (internal quotation marks omitted). Thus, "[section] 706(1) empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing *how* it shall act.'" *Id.* at 64, 124 S.Ct. 2373 (quoting *Attorney General's Manual on the Administrative Procedure Act* 108 (1947)). Particularly relevant to this case, the Court specified that "when an agency is compelled by law to act within a certain time period, [even if] the manner of its action is left to the agency's discretion, a court can compel the agency to act. . . ." *Id.* at 65, 124 S.Ct. 2373.

Defendants focus their *SUWA*-based challenge to the State's removal claim by arguing only that § 2566(c)(1) does not contain an action that an agency is *required* to take (rather than arguing, for instance, that their conduct does not amount to a *discrete* agency action or that any action they have taken is not *final* for purposes of the APA). (*See* ECF No. 17 at 22–30.) Defendants advance several related arguments to support their assertion that the agency action described in § 2566(c)(1) is discretionary and thus unable to form the basis of claim for which the court could grant relief under § 706(1). Most importantly, Defendants make a broad-sweeping structural argument about the relationship between § 2566(c)(1) and § 2566(d)(1). Reduced to essentials, Defendants argue that any failure to meet the subsection (c)(1) requirement to remove one ton of plutonium from SRS by the January 1, 2016 deadline has only one remedy: the economic and impact assistance payments outlined in subsection (d)(1). (*See* ECF No. 17 at 24 ("Read together, subsection (d) functions as the enforcement mechanism for subsection (c).").) Defendants assert, therefore, that subsection (c)(1) does not

impose a mandatory duty to remove the plutonium, enforceable under § 706(1), because the statute itself permits Defendants to opt not to remove the plutonium. Underlying this argument is Defendants' assertion that the removal provisions in subsections (c)(1) and (d)(1)(B) refer to the same one ton of plutonium, such that if, at any time in calendar years 2014 through 2021, Defendants remove only one ton of plutonium from SRS, then not only has the subsection (c)(1) removal requirement been satisfied, but also the subsection (d)(1)(B) removal event that "de-triggers" the economic and impact assistance payments has also occurred and is in effect for all subsequent relevant years. In other words, Defendants contend that, under both (c)(1) and (d)(1), only one ton of plutonium need ever be removed and that such removal precludes enforcement of the economic and impact assistance payments.

The State, of course, reads subsection (d)(1) to refer to one ton (or, rather, one ton per year) of plutonium that is distinct from the one ton of plutonium in subsection (c)(1). In its view, the removal of one ton of plutonium pursuant to subsection (c)(1) would have no effect on the economic and impact assistance payment provisions of subsection (d)(1). If the statute refers to distinct amounts of plutonium in (c)(1) and (d)(1), then Defendants' removal of only one ton of plutonium would neither prevent activation of the economic and impact assistance payments nor de-trigger those payments once they are activated.

Because the argued statutory interpretation is one that the CFC likely would be required to make before concluding whether, and to what extent, Defendants are liable to pay the State the subsection (d)(1) economic and impact assistance payments, both the CFC and this court would be forced to adjudicate an issue that is material and perhaps dispositive to the claim that is in the other court. In such circum-

stances, principles of comity likely would oblige this court or the CFC to stay proceedings until the other court's adjudication was complete. *See Ulmet v. United States*, 888 F.2d 1028, 1031 (4th Cir. 1989); *Feller v. Brock*, 802 F.2d 722, 727–28 (4th Cir. 1986).

### 4. Uncertainty in options counsels in favor of further briefing.

In the absence of bifurcation, the State's case would likely be transferred to the CFC under § 1631, a statute that attempts to reduce the claim-killing risks that accompany the jurisdiction scheme governing claims against the United States. "Because suits against the United States may be brought in the district courts in some circumstances and in the Court of Federal Claims in other circumstances, it is likely that some litigants will mistakenly file some claims in a court that lacks jurisdiction." *Cnty. of Cook*, 170 F.3d at 1089. "Section 1631 was clearly intended by Congress to remedy this problem through the simple mechanism of a transfer to the court of proper jurisdiction." *Id.*; *see also Taylor v. United States*, 128 Fed.Cl. 635, 638–40 (2016) (canvassing legislative history). Thus, § 1631 implements a congressional policy disfavoring procedures that, in effect, prove fatal to claims brought against the United States solely because the claim was filed in the wrong court. At the same time, congressional policy, embodied in § 1500, disfavors parallel litigation of the same issues by the same parties in separate federal courts and thus forces litigants to choose the claims against the United States they wish to pursue, as well as the court in which they wish to pursue them. *Harbuck*, 378 F.3d at 1328.

The court notes that the State has not asked for voluntary dismissal to pursue its claims in the CFC, and neither party sought a § 1631 transfer of the case to the CFC. Moreover, in their filings, neither party addressed transfer, dismissal, bifur-cation, or the effect of the confluence of § 1631 and § 1500. Consequently, the instant order is the first time these issues have been discussed in this case. Because the parties have never addressed these issues, because the policies animating § 1631 and § 1500 counsel in favor of affording the State the opportunity to choose in which forum it should bring a claim, and because the State might be forced to choose to litigate only one of its claims, the court declines to determine at this juncture whether the State's monetary claim should be either transferred or dismissed, and the court declines to consider Defendants' Rule 12(b)(6) challenge to the removal claim. Instead, the court will make the determination and consider the challenge after additional briefing is submitted as described below.

## IV. CONCLUSION

For the foregoing reasons, the court declines to rule on Defendants' Motion to Dismiss (ECF No. 17) for failure to state a claim for which relief could be granted as to the removal claim under Fed. R. Civ. P. 12(b)(6) until supplemental briefs, herein described are submitted. The parties are **DIRECTED** to file briefs that address the following issues:

1. Whether the court should transfer the monetary claim to the CFC, pursuant to 28 U.S.C. § 1631.

2. Whether the court should dismiss the monetary claim without prejudice to the State's ability to refile the claim in an action in the CFC.

The briefs shall comply with rules governing memoranda in Local Civ. Rule 7 (D.S.C.) and must be filed by **November 30, 2016.**

**IT IS SO ORDERED.**